Benjamin J. Siegel (256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

Jeffrey L. Kodroff (*pro hac vice* to be filed)
Eugene A. Spector (*pro hac vice* to be filed)
SPECTOR ROSEMAN KODROFF & WILLS, PC
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
jkodroff@srkattorneys.com
espector@srkattorneys.com

*Counsel for Plaintiff and the Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| TYMIR OLIVER, on behalf of himself and all others similarly situated,<br><br>                              Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; PAC-12 CONFERENCE; THE BIG TEN CONFERENCE, INC.; THE BIG TWELVE CONFERENCE, INC.; SOUTHEASTERN CONFERENCE; and ATLANTIC COAST CONFERENCE,<br><br>                              Defendants. | No.<br><br>COMPLAINT<br><br><br>CLASS ACTION<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................10

III.    PARTIES ............................................................................................................11

     A.     Plaintiff ....................................................................................................11

     B.     Defendants ................................................................................................13

     C.     Co-Conspirators .......................................................................................17

IV.     THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION...................17

V.      RELEVANT MARKET ......................................................................................19

VI.     FACTUAL ALLEGATIONS ..............................................................................24

     A.     An Overview of the NCAA ......................................................................24

          1.     History and Purpose ......................................................................24

          2.     Governance Structure ...................................................................26

          3.     Bylaws and Enforcement ..............................................................28

     B.     The commercial nature of Division I sports .............................................31

     C.     The NCAA's history of antitrust violations .............................................43

     D.     The challenged restraints are not necessary to serve any purported procompetitive purpose. ...........................................................................48

          1.     The restraints are not necessary to preserve consumer demand for college sports. ........................................................................48

               a.     Any procompetitive justification based on consumer demand for college sports is also irrelevant because it concerns an entirely different market. ...........................................................................54

          2.     Education and NIL compensation are not mutually exclusive. ....................55

          3.     The NIL restrictions do not prevent exploitation—they are exploitative. ...................................................................................56

     E.     There is significant support for allowing athletes to receive NIL compensation and Plaintiff has been damaged by Defendants' anticompetitive restraints...........................................................................58

          1.     California Fair Pay to Play Act and related state legislation.........................58

2.  The NCAA and its members have made statements supporting student-athletes' NIL rights, which is a stark departure from previous positions taken before federal courts. ...............................59

3.  Statements from the Knight Commission on Intercollegiate Athletics. ...............................66

4.  The NCAA makes exceptions that have allowed some athletes to profit from the value of their NILs. ...............................67

5.  Student-athletes have sought the ability to compete without anticompetitive restraint in the market for NIL payments, and would receive such compensation absent Defendants' unlawful restraints. ...............................68

6.  Corporate sponsors value student-athlete NILs, and would compete for the rights to use Plaintiff's NIL absent Defendants' anticompetitive restraints ...............................71

VII.   CLASS ACTION ALLEGATIONS ...............................74

VIII.   ANTITRUST ALLEGATIONS ...............................77

IX.   CAUSES OF ACTION ...............................78

FIRST CLAIM FOR RELIEF  VIOLATION OF SECTION 1 OF THE SHERMAN ACT – 15 U.S.C. § 1 UNREASONABLE RESTRAINT OF TRADE ...............................78

SECOND CLAIM FOR RELIEF  VIOLATION OF SECTION 1 OF THE SHERMAN ACT – 15 U.S.C. § 1 UNREASONABLE RESTRAINT OF TRADE – GROUP BOYCOTT / REFUSAL TO DEAL ...............................80

THIRD CLAIM FOR RELIEF  UNJUST ENRICHMENT ...............................82

REQUEST FOR RELIEF ...............................82

JURY DEMAND ...............................83

1    For his Complaint against Defendants National Collegiate Athletic Association ("NCAA"),

2   Pac-12 Conference, Big Ten Conference ("Big Ten"), Big Twelve Conference ("Big 12"),

3   Southeastern Conference ("SEC"), and Atlantic Coast Conference ("ACC"), Plaintiff, on his own

4   behalf and on behalf of all others similarly situated, allege as follows:

## I.    INTRODUCTION

6    1.    4.34 million people were watching when the left sneaker of college basketball's

7   biggest star split open on national television in the opening minutes of a 2019 game between

8   archrivals Duke and the University of North Carolina. In that moment, the true nature of big-time

9   college sports—and the powerful commercial influences that surround them—were laid bare. Zion

10  Williamson, a Duke freshman and future number one pick in the 2019 NBA draft, suffered a knee

11  sprain that forced him to the sidelines and sparked immediate speculation about whether the injury

12  would end his career. By the following day, Nike, the manufacturer of the shoe Williamson was

13  wearing, had suffered a $1.1 billion decline in its stock market value that analysts attributed directly

14  to the incident.

15   2.    Williamson wore Nikes because Duke has a multi-million dollar sponsorship contract

16  with the company that requires the school's athletes to wear Nike apparel during all competitions.

17  But, while the value of this lucrative deal is directly related to and derived from the commercial

18  benefits that Nike gains by associating its products with college athletes—particularly star players

19  like Williamson—Williamson himself earned nothing from the arrangement because the NCAA

20  prohibits all Division I athletes from being compensated for the commercial use of their names,

21  images, and likenesses ("NILs").

22   3.    The hard work of college athletes has translated into billion-dollar television deals,

23  multi-million dollar coaching salaries, extravagant facilities, and lucrative commercial licensing and

24  sponsorship agreements that greatly benefit the NCAA and its member conferences and schools. For

25  those in positions of power, the college sports industry has become immensely profitable. The

26  median salary for an athletic director at a Division I institution is now over $500,000 a year. More

27  than 100 coaches at Division I schools earn over $1 million per year, with the top 25 football coaches

28  earning an average of $5.2 million annually, and the top 25 basketball coaches earning an average of

CLASS ACTION COMPLAINT                    - 1 -

$3.2 million annually. Although student-athletes produce the product that fuels this industry, and they are the individuals whose athleticism, hard work, and character make college sports so popular, these same young men and women receive only a tiny fraction of the revenues they generate, while continuing to face severe penalties for failing to abide by a labyrinth of rules that restrict any meaningful participation in the industry.

4.      Through its Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including the conduct of schools, conferences, third-party business partners, and student-athletes. Among the many areas that the NCAA regulates are the compensation and benefits that athletes may receive while participating in college sports. At various points in time the NCAA has claimed that these rules are necessary to promote the NCAA's principle of "amateurism" and to preserve "a clear line of demarcation between intercollegiate athletics and professional sports."

5.      At issue in this Complaint are a particular subset of the NCAA's rules that prohibit student-athletes from receiving anything of value in exchange for the commercial use of their NILs.

6.      The NCAA proclaims that its overarching purpose is "to create a safe, and equitable environment that allows student-athletes to reach their full potential in academics, athletics and life," and that it is "united around one goal: creating opportunities for college athletes." The NCAA further purports to protect college athletes from commercial exploitation, yet it has conspired to create an anticompetitive market where student-athletes are unable to benefit from the same opportunities that are available to their fellow classmates and powerless to realize the commercial value of their *own* NILs. These young men and women—often from socio-economically disadvantaged backgrounds— are deprived of the educational opportunities and economic benefits that the market would pay for their personal property in an open market.

7.      And, despite the NCAA's capacity and willingness to enforce rule violations against athletes, it has failed since its inception to effectively and consistently police its rules against exploitative outside influences. Indeed, it is clear that the NCAA has no desire to pass any rules that would threaten the financial rewards the current system heaps upon its many beneficiaries. Notably absent from NCAA bylaws is any proscription or limitation on the amount of money that large

corporate interests can pour into college sports and university athletic programs, and companies take advantage of the opportunity to derive immense profits by associating their brands with talented student-athletes. Though the NCAA concedes that "corporations are willing to pay premium prices for the opportunity to put their products before the eyes of an enormous audience,"[1] and despite its purported commitment to protect student-athletes from "exploitation by professional and commercial enterprises," it has failed to implement any meaningful restrictions on corporate interests and money. Moreover, because the NCAA lacks jurisdiction as a private entity to regulate agents or third parties directly, any penalties it imposes for rule violations fall disproportionately on student-athletes.

8.      With so many cameras pointed at student-athletes and the inability to deal directly with the athletes, companies instead enter into sponsorship and endorsement deals with the NCAA, conferences, schools, and coaches. As of 2019, Nike, Adidas, and Under Armor had exclusive rights to outfit 97 percent of all Division I football and basketball programs. Schools and coaches derive millions of dollars each year in income and non-cash benefits from these deals and college athletic programs have become defined by the apparel company that outfits their teams.

9.      The NCAA, conferences, and schools also promote themselves and their athletic programs via social media such as Instagram and Twitter, and have their athletes participate in social media blitzes for the commercial benefit of the NCAA and its members. Coaches and others associated with college athletic programs also reap the financial rewards of payments from social media companies and other lucrative aspects of the online economy. Yet, the NCAA's draconian NIL restrictions prevent student-athletes from commercially benefitting from their postings on social media, despite the fact that other college students are able to commercially benefit from social media opportunities and many do.

10.     Every person has a property interest in his or her public personality and should have the sole right to benefit from and restrict its commercial use. NCAA Executive Vice President of Regulatory Affairs, Oliver Luck, acknowledged as much at the 2015 NCAA Convention, stating that

---

[1] NCAA Task Force on Commercial Activity in Division I Intercollegiate Athletics, Final Report Supplement No. 6 (2009).

"the name, image, likeness for an individual is a fundamental right—that any individual controls his or her name, image and likeness—and I don't believe that a student-athlete who accepts a grant-in-aid simply waives that right to his or her name, image, likeness."[2]

11.     Notwithstanding the existence of this right and its accompanying economic value, the NCAA and its members have committed violations of the federal antitrust laws and common law by engaging in an overarching conspiracy to: (a) fix the amount that student-athletes may be paid for the licensing, use, and sale of their names, images, and likenesses—**at zero**; and (b) foreclose student-athletes from the market for licensing, use, and sale of their names, images, and likenesses entirely. In addition to violating the antitrust laws, Defendants have also unjustly enriched themselves and their for-profit business partners.

12.     Absent the challenged restraints, Division I student-athletes would receive compensation for the use of their NILs in an open market. Division I athletes have created tremendous value in their NILs through their participation in both athletic and non-athletic activities. For example, in 2019 "[a]n exuberant top-scoring floor routine by UCLA's Katelyn Ohashi went viral[,] making her one of the most famous college gymnasts ever. But NCAA rules prevented Ohashi from making any money from the performance."[3] In a video op-ed featured by the New York Times, Ohashi argued that college athletes should be able to earn income from their athletic achievements. She said that in her "senior year [her] routine went viral with over 100 million views," but she was not able to earn a single dollar from this social media popularity.[4] Under the NCAA's rules, UCLA and the NCAA can and do profit off of the value of Ms. Ohashi's NIL, without allowing her to recoup any of that value for herself. And unfortunately, for a college gymnast like

---

[2] Steve Berkowitz, *Oliver Luck Brings Own Perspective to NCAA on O'Bannon Name and Likeness Issue*. USAToday.com, Jan. 16, 2015, https://www.usatoday.com/story/sports/college/2015/01/16/ncaa-convention-oliver-luck-obannon-name-and-likeness-court-case/21873331/ (last visited June 14, 2020).

[3] Katelyn Ohashi, *Everyone Made Money Off My N.C.A.A. Career, Except Me*, nytimes.com, Oct. 9, 2019, https://www.nytimes.com/2019/10/09/opinion/katelyn-ohashi-fair-play-act.html (last visited June 14, 2020).

[4] *Id.*

1    Ms. Ohashi, the value of her NIL will quickly diminish after graduation without viable professional

2    sports options.

3          13.    Recent analyses demonstrate the valuable nature of student-athlete NILs across a wide

4    range of Division I sports, including via social media platforms such as Twitter and Instagram. And

5    the ability to capture that value while still in school is critically important for student-athletes, the

6    majority of whom will not have an opportunity to compete professionally after college. As Duke

7    men's basketball creative director, Dave Bradley explained, "[f]or 95 percent of college athletes,

8    their college careers will be the best time to grow and leverage their personal brands. Unless

9    America knows you on a first-name basis like Zion or Kyrie, fan affinity and networking opportunity

10   peaks in college. Therefore, it's crucial for athletes to understand and maximize their brands from

11   day one."[5]

12         14.    School officials have also expressed support for a change in the NIL restraints.

13   Nebraska head football coach, Scott Frost recently stated that, "regardless of what change comes in

14   NIL legislation, we want every Nebraska athlete to be prepared with the blueprint for success beyond

15   the field." Athletics Director Garrett Klassy further indicated that Nebraska has "no concern" about

16   changes to NIL rules. "We have the most passionate fan base and sponsors in the country and we

17   fully expect them to continue to support Nebraska if NIL legislation changes."[6] University of

18   Michigan head football coach, Jim Harbaugh similarly confirmed that he and others in the UM

19   athletic department "believe the name, image and likeness is a very good thing. A player should have

20   the same opportunity that a football coach has to profit off their name, image and likeness… Again,

21   not the best to have a rule that says you can't. So we're all for it. We're all for name, image and

22   likeness."[7]

23

24         [5] Adam Rowe, *@DukeMBB's social media dominance could mean $$ for its athletes*,
     247sports.com, May 22, 2020, https://247sports.com/college/duke/Article/duke-blue-devils-

25   basketball-name-image-and-likeness-athletes-147406166/ (last visited June 14, 2020).

26         [6] J. Brady McCollough, *Nebraska prepares for student-athlete branding by partnering with
     Opendorse*, latimes.com, Mar. 10, 2020, https://www.latimes.com/sports/story/2020-03-10/nebraska-
     opendorse-nil-athlete-branding (last visited June 14, 2020).

27         [7] Clayton Sayfie, *Jim Harbaugh Is 'All For" NIL Proposal*, May 9, 2020, michigan.rivals.com,

28   https://michigan.rivals.com/news/jim-harbaugh-is-all-for-nil-proposal (last visited Jun 14, 2020).

CLASS ACTION COMPLAINT                          - 5 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15.     Absent the challenged restraints, schools would also compete amongst one another by offering additional educational resources and services to help student-athletes learn marketing skills and develop and grow their personal brands. Indeed, on March 10, 2020, the University of Nebraska announced its partnership with Opendorse to launch the first program designed to help student-athletes build their personal brand if the NCAA's NIL restraints are lifted. Nebraska's "Ready Now" program will be available to athletes in all varsity sports and will offer each athlete a current valuation of their personal brand, review and flag content that could have a negative impact on that brand, and provide insight to increase value. On June 1, 2020, the University of Colorado announced its own plans for a similar program that would provide the school's athletes with tools and resources to enable them to capitalize on their name, image, and likeness in the event of a change in NCAA rules. The "Buffs with a Brand" program will provide CU student-athletes with new educational resources related to personal brand management, entrepreneurship, and financial literacy. Athletic Director, Rick George expressed his support for the new program, noting that, "building a personal brand, and developing the skills to be a successful entrepreneur will help our student-athletes capitalize and build on their time at CU and beyond."[8]

16.     In its multimillion and multibillion dollar deals with broadcasters, the NCAA and its members institutions also reap tremendous financial rewards from using the NILs of college athletes on television. For example, in 2016 the NCAA negotiated an eight-year extension (until 2032) of its media contract for the broadcasting rights to March Madness, the annual Division I basketball tournament.[9] Under that agreement, the NCAA will receive $1.1 billion per year (an annual increase of over $325 million from the prior contract).[10] Similar television deals provide millions of dollars to

---

[8] David Plati, *CU Announces "Buffs With A Brand" Program*, June 1, 2020, cubuffs.com, https://cubuffs.com/news/2020/6/1/general-cu-announces-buffs-with-a-brand-program.aspx (last visited June 14, 2020).

[9] Frank Pallotta, *NCAA Extends March Madness TV Deal with Turner, CBS until 2032*, Apr. 12, 2016, https://money.cnn.com/2016/04/12/media/ncaa-march-madness-turner-cbs/index.html#:~:text=The%20NCAA%20has%20extended%20its,game%20for%20another%20eight%20years.&text=In%202010%2C%20the%20NCAA%20and,is%20now%20extended%20to%202032 (last visited June 14, 2020).

[10] *Id.*

the NCAA, its conferences, and schools for broadcasting a variety of other men's and women's sports. From these massive deals, student-athletes receive no compensation for the use of their NILs.

17.     One important recent factual development related to student-athlete NIL rights was the passing of California's Fair Pay to Play Act,[11] in addition to similar proposed legislation in numerous other states. If it goes into effect—the law is being subject to an intense adverse lobbying campaign by the NCAA, which also has threatened legal action in an attempt to stop it—the Fair Pay to Play Act will essentially create an unrestricted market in California for student-athletes and other parties to use and profit from the use of student-athlete NILs. As of April 2020, a total of 34 states had introduced bills recognizing college athletes' right to compensation for the commercial use of their NILs.

18.     In the face of intense public pressure, and explicitly this legislation (as the NCAA has admitted), the NCAA recently changed its official policy on student-athlete NIL compensation and now claims to be embracing the concept and backtracking on prior claims that such compensation would destroy college sports. In October 2019, the NCAA announced that its top governing board "voted unanimously to permit students participating in athletics the opportunity to benefit from the use of their name, image, and likeness." On April 28, 2020, the NCAA formally endorsed an internal working group report recommending rule changes to permit student-athletes to receive compensation for product endorsements, autographs, and personal appearances, among other things.

19.     The NCAA's current endorsement of these recommendations make clear that its previous position, including in briefing before federal trial and appellate courts—that *any* form of NIL payments to student-athletes would irreparably damage college athletics—is entirely unfounded and constitutes a conspicuous about-face by the NCAA. Specifically commenting on the issue of name, image, and likeness compensation in 2014 briefing before the Ninth Circuit Court of Appeals in the *O'Bannon* case, the NCAA opposed providing *any* form of NIL compensation, describing such payments as being "no less anathema to amateurism than paying football players $100 per sack."[12]

---

[11] Cal. Educ. Code § 67456.

[12] Brief for NCAA at 57, *O'Bannon v. NCAA*, Nos. 14-16601 & 14-17068 (9th Cir. Nov. 14, 2014, ECF No. 13-1).

CLASS ACTION COMPLAINT                     - 7 -

1       20.    Despite the NCAA's recent indications that it now supports changes to its NIL rules,

2 judicial action is necessary to enjoin the current unlawful restraints and provide adequate relief to the

3 thousands of student-athletes who have been damaged by them. For one, the NCAA has yet to make

4 any actual rule changes, and draft NIL legislative proposals from its three divisions are not due until

5 2021. Moreover, the true extent of any changes that the NCAA will ultimately make—if they make

6 any changes at all—remains unclear. The NCAA's recent proclamations on the topic have been

7 heavily criticized as vague, indefinite, and non-committal. As U.S. Congresswoman and former

8 president of NCAA member schools Miami University and the University of Wisconsin, Donna

9 Shalala, remarked about the 2020 NCAA report, "My initial reaction is it's a PR document."[13]

10 Additionally, while the NCAA claims to be working toward some "modernization" of its NIL rules,

11 it is also actively and aggressively seeking an exemption from federal and state antitrust and other

12 laws—including preemption of the new state laws seeking to codify student-athletes' rights to

13 commercially use their NILs—which would allow the NCAA and its members to continue their

14 anticompetitive practices without legal repercussion.[14] Finally, the NCAA has not made any

15 statements indicating that it will financially compensate the thousands of student-athletes who it

16 already injured by unlawfully prohibiting them from benefitting from their own NILs.

17       21.    The NCAA's current "zero compensation" policy for student-athlete NILs does not

18 enhance consumer demand for college sports (which in any event concerns a market separate from

19 the labor market for student-athletes that has been impacted by the anticompetitive restraints), nor

20 does it further any other claimed procompetitive purpose. Recent surveys and other contemporary

21 measures of public sentiment, including the state legislation discussed *supra*, indicate that consumer

22 demand for college sports would not diminish if student-athletes were allowed to receive additional

23 compensation. Indeed, the results of a 2019 Turnkey Sports poll of more than 2,000 senior-level

---

[13] *See* Ross Dellenger, *Congress Members Lambaste NCAA's Vague and Restrictive NIL 'PR Document,'* si.com, Apr. 30, 2020, https://www.si.com/college/2020/04/30/ncaa-nil-changes-congress-reaction (last visited June 14, 2020).

[14] *See i.e.*, Ben Nuckols, *AP Exclusive: NCAA, 2 conferences spend $750,000 on lobbying*, apnews.com, Feb. 10, 2020, https://apnews.com/c298c08fbaebfdcfa97943bd5c31fa21 (last visited June 14, 2020); *see also* May 23, 2020 Letter to Congressional leadership from Power Five Conferences, attached hereto as Exhibit A.

sports industry executives suggest that there would likely be a *positive* impact on fan interest if college athletes are permitted to monetize their NILs.[15] And, to the extent that any procompetitive purposes are served by the rules (they are not), reasonable and less restrictive alternatives are available. For example, an injunction could permit athletes to receive compensation only from third parties, or for non-game-related uses of their NILs in commercial activities including, but not limited to: business promotions, autograph signings, social media advertising and content creation, product endorsements, licensed merchandise sales, personal appearances, books, and movies.

22.     Accordingly, on behalf of a Class of former and current Division I student-athletes, Plaintiff requests an injunction permanently restraining Defendants from enforcing their unlawful and anticompetitive agreements to restrict the amount of name, image, and likeness compensation available to Class Members.[16]

23.     Additionally, on behalf of the members of the Social Media Damages Sub-Class, Plaintiff seeks the social media earnings that members of this Sub-Class would have received absent Defendants' unlawful conduct.[17] And on behalf of the members of the Group Licensing Damages Sub-Class, Plaintiff seeks the share of game telecast group licensing revenue members of this Sub-Class would have received absent Defendants' unlawful conduct.[18]

---

[15] Michael Smith, Liz Mullen, *College Sports: Sharper Resolution*, sportsbusinessdaily.com, Dec. 2, 2019, https://www.sportsbusinessdaily.com/Journal/Issues/2019/12/02/In-Depth/NIL.aspx (last visited June 14, 2020).

[16] The Declaratory and Injunctive Relief Class is defined as: "All current and former student-athletes who compete on, or competed on, an NCAA Division I athletic team at any time between four (4) years prior to the filing of this Complaint and the date of judgment in this matter." *See infra*, Part VII.

[17] The Social Media Damages Sub-Class is defined as "All current and former student-athletes who compete on, or competed on, an NCAA Division I athletic team at a college or university that is a member of one of the Power Five Conferences, at any time between four (4) years prior to filing of this Complaint and the date of judgment in this matter." *See infra*, Part VII.

[18] The Group Licensing Damages Sub-Class is defined as: "All current and former student-athletes who compete on, or competed on, an NCAA Division I men's or women's basketball team or an FBS football team, at a college or university that is a member of one the Power Five Conferences, at any time between four (4) years prior to filing of this Complaint and the date of judgment in this matter." *See infra*, Part VII.

CLASS ACTION COMPLAINT                     - 9 -

## II.    JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. 28 U.S.C. §§ 15(a) and 26. The Court also has jurisdiction over this matter under 28 U.S.C. §1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some of the members of the proposed class are citizens of a state different from the Defendants.

25.     Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. §1391(b) and (c) and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.

26.     This Court has personal jurisdiction over Defendants because, *inter alia*, they: (a) transacted business throughout the United States, including in this District; (b) participated in organizing intercollegiate athletics contests, and/or licensing or selling merchandise throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Numerous NCAA Division I universities or colleges also are found within this District, *i.e.*, the University of California–Berkeley ("Cal"), Stanford University, Santa Clara University, the University of San Francisco ("USF"), and St. Mary's College.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.    PARTIES

**A.    Plaintiff**

### <u>Tymir Oliver</u>



27.    Plaintiff Tymir Oliver, an individual, is a resident of New Castle, Delaware and a Division I student-athlete who competed for the University of Illinois men's football team.

28.    Before college, Mr. Oliver was a highly recruited star athlete. He was a three-star recruit by 247 Sports and ESPN.com and ranked as a top-30 recruit in Pennsylvania. ESPN.com ranked him as No 24 and 247 Sports had him as its No. 28 ranked player. In 2015, he was selected First-Team All-State by the Pennsylvania Football Writers Association. He was also named all-state twice and all-city three times. He captained his football team as a junior and senior while also being ranked in the top five of his graduating class

29.    Mr. Oliver received full athletic scholarship offers from numerous top Division I programs including Boston College, Northwestern, Michigan State, University of Virginia, University of Pittsburgh, Rutgers and Temple. He ultimately accepted the offer from University of Illinois starting in 2016 because he thought it was a chance to be a part of something great.

30.    Mr. Oliver played in twelve games as a freshman, mostly on special teams. However, in just his sophomore year he was selected as a Team Captain and played in twelve games, while starting ten at defensive tackle. During the season he had 33 tackles, 4.5 tackles for losses (tied for

second on the team), 3.0 sacks (tied for third on the team) while also having two pass defenses and two hurries. In his junior season he started all twelve games at defensive tackle with 27 tackles, 2.5 tackles for losses, 1.0 sacks, four pass break-ups and one quarterback hurry. He also had a career-high seven tackles against rival Iowa. In his senior season he played in thirteen games with twelve solo tackles and 17 assisted tackles with 4.5 tackles for losses. He tied his career-high with seven tackles versus No. 6 ranked Wisconsin to help Illinois win 24-23 and complete one of the biggest upsets in Big Ten history.

31.     As an elite athlete and Team Captain, Mr. Oliver's name and face were repeatedly used by the University of Illinois to make money by selling tickets and jerseys. Specifically, the University of Illinois used his image for homecoming pictures. During his junior year Mr. Oliver was also required to participate in a photoshoot for the new University of Illinois Nike jersey reveal. His picture was front and center on the "Fighting Illini" homepage, specifically stating the "The new blue jerseys will be available for fans to purchase this fall."[19] He was also included in a video montage used to introduce and sell the University of Illinois' new Nike jerseys. In addition, Tymir's image was used on tickets and flyers all around the campus promoting the team and upcoming games. His picture was also used by the University of Illinois in its numerous social media posts to promote games and open practices. The Fighting Illini Football page and other University of Illinois social media accounts would have pre- and post-game content that included Mr. Oliver to promote the sale of tickets and merchandise.

32.     Mr. Oliver has never derived any personal profit from the University of Illinois's use of his name, image and likeness on any of its marketing or social media to sell tickets or merchandise and gain television exposure, which increased revenues for the university because NCAA rules prohibit him from doing so.

---

[19] *See* https://fightingillini.com/news/2018/4/5/football-fighting-illini-unveil-new-uniform-designs.aspx (last visited July 8, 2020).

CLASS ACTION COMPLAINT                    - 12 -

1

**B.      Defendants**

2

33.      **National Collegiate Athletic Association ("NCAA")** describes itself as an

3

"unincorporated not-for-profit educational organization founded in 1906," and maintains its principal

4

place of business located at 700 W. Washington Street, Indianapolis, Indiana 46204. The NCAA

5

further states that it "is the organization through which the colleges and universities of the nation

6

speak and act on athletic matters at the national level." It is composed of more than 1,200 colleges,

7

universities, and athletic conferences located throughout the United States.

8

34.      Through the NCAA Constitution and Bylaws, the NCAA and its members have

9

adopted regulations governing all aspects of college sports. The Constitution and Bylaws were

10

adopted by votes of the member institutions and may be amended by votes of the member

11

institutions. The NCAA has also established an enforcement program to ensure that institutions and

12

student-athletes comply with NCAA rules. Through its enforcement program, the NCAA has the

13

authority to impose severe penalties on member schools and student-athletes for non-compliance.

14

35.      The NCAA includes 1,102 active member schools, and these schools are organized

15

into three Divisions. Division I includes 353 schools, including 242 with major football programs.

16

Divisions II and III include schools with much less extensive or no football programs. As a practical

17

matter, any academic institution that wishes to participate in any meaningful way in the highest and

18

most popular levels of college sports must maintain membership in the NCAA and abide by the

19

Division I rules and regulations promulgated by the NCAA and its members.

20

36.      In its Consolidated Financial Statements for the fiscal year ending August 31, 2019,

21

the NCAA reported total revenues of $1,118,495,545.[20]

22

37.      **Pac-12 Conference ("Pac-12")** is an unincorporated association, with its principal

23

place of business located in this District at 360 3rd Street, third floor, San Francisco, California

24

94107. The Pac-12 is a multi-sport collegiate athletic conference, and a formal "conference member"

25

of Defendant NCAA's Division I. In its 2017 IRS Form 990, the most recent one available for public

26

inspection, the Pac-12 identified itself as a tax-exempt organization pursuant to section 501(c)(3) of

27

_____

28

[20] NCAA Consolidated Financial Statements August 31, 2019 and 2018.

the U.S. Internal Revenue Code, and stated that, for the fiscal year ending June 30, 2018, it obtained gross revenues of $496,930,601. The Pac-12's "2018-19 Handbook" states that the conference was organized for purposes including: "[t]o provide its members with a jointly governed body for sponsoring, supervising and regulating intercollegiate athletics as a conference member of the National Collegiate Athletics Association ('NCAA') in accordance with the principles, policies, constitution and bylaws of the NCAA" and "[t]o assist its members in funding and promoting their intercollegiate athletics programs."

38.     The Pac-12's current members are the following 12 institutions: University of Arizona, Arizona State University, University of California–Berkeley, University of Colorado, University of Oregon, Oregon State University, Stanford University, University of California, Los Angeles, University of Southern California, University of Utah, University of Washington, and Washington State University.

39.     Defendant Pac-12 during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Class Members, and will continue to damage Class Members unless enjoined.

40.     **The Big Ten Conference, Inc. ("Big Ten")** is a nonprofit corporation, organized under the laws of Delaware, with its principal place of business located at 5440 Park Place, Rosemont, Illinois 60018. The Big Ten is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990, the most recent one available for public inspection, the Big Ten identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for the fiscal year ending June 30, 2018, it obtained gross revenue of $758,899,883.

41.     The Big Ten's members are the following 14 institutions: University of Illinois at Urbana-Champaign, Indiana University, University of Iowa, University of Michigan, Michigan State University, University of Minnesota, University of Nebraska–Lincoln, Northwestern University, Ohio State University, Pennsylvania State University, Purdue University, University of Wisconsin–Madison, University of Maryland, and Rutgers University. All of the Big Ten's football members are also members of the NCAA's Division I, Football Bowl Subdivision.

42.     Defendant Big Ten during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Class Members, and will continue to damage Class Members unless enjoined.

43.     **The Big 12 Conference, Inc. ("Big 12")** is a nonprofit corporation organized under the laws of Delaware, with its principal place of business located at 400 East John Carpenter Freeway, Irving, Texas 75062. The Big 12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990, the most recent one available for public inspection, the Big 12 stated that is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that, for the fiscal year ending June 30, 2018, it obtained gross revenues of $373,924,498. The Big 12 further stated in its IRS filing that its mission is to "organize, promote and administer intercollegiate athletics among its member institutions" and to "optimize revenues and provide supporting service sompatible [sic] with both academic and competitive excellence."

44.     The Big 12's current members are the following 10 institutions: Baylor University, Iowa State University, University of Kansas, Kansas State University, University of Oklahoma, Oklahoma State University, University of Texas–Austin, Texas Christian University, Texas Tech University, and West Virginia University. All of the Big 12's football members are also members of the NCAA's Division I, Football Bowl Subdivision.

45.     Defendant Big 12 during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Class Members, and will continue to damage Class Members unless enjoined.

46.     **Southeastern Conference ("SEC")** is an unincorporated association, with its principal place of business located at 2201 Richard Arrington Boulevard North, Birmingham, Alabama 35203-1103. The SEC is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990, the most recent one available for public inspection, the SEC identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for the fiscal year ending August 31, 2018, it obtained revenues of $659,938,592. It further identified its mission is to

1   "promote and administer intercollegiate athletic competition among its 14 member institutions

2   located in the Southeastern United States."

3      47.   The SEC's current members are the following 14 institutions: University of Florida,

4   University of Georgia, University of Kentucky, University of Missouri, University of South

5   Carolina, University of Tennessee, Vanderbilt University, University of Alabama, University of

6   Arkansas, Auburn University, Louisiana State University, University of Mississippi, Mississippi

7   State University, and Texas A&M University. All of the SEC's football members are also members

8   of the NCAA's Division I, Football Bowl Subdivision.

9      48.   Defendant SEC during the Class Period participated in the collusive restraint of trade

10   and other violations of law alleged in this Complaint, has thereby damaged Class Members, and will

11   continue to damage Class Members unless enjoined.

12      49.   **Atlantic Coast Conference ("ACC")** is an unincorporated association with its

13   principal place of business located at 4512 Weybridge Lane, Greensboro, North Carolina 27407.

14   The ACC is a multi-sport collegiate athletic conference and a formal "conference member" of

15   Defendant NCAA's Division I. In its 2017 U.S. Internal Revenue Service ("IRS") Form 990, the

16   most recent one available for public inspection, the ACC stated that it is a tax-exempt organization

17   pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that, for the fiscal year ending

18   June 30, 2018, it obtained gross revenues of $464,677,828. The ACC further stated in its IRS filing

19   that it "exists to promote and regulate inter-collegiate athletic programs for and among twelve

20   member institutions, all of which are non-profit educational institutions."

21      50.   The ACC's current members are the following 14 institutions: Boston College,

22   Clemson University, Duke University, Florida State University, Georgia Institute of Technology

23   ("Georgia Tech"), University of Miami, University of North Carolina–Chapel Hill, North Carolina

24   State University, University of Pittsburgh, Syracuse University, University of Virginia, Virginia

25   Polytechnic Institute and State University ("Virginia Tech"), Wake Forest University, and the

26   University of Louisville. Also, as the ACC stated in its 2012-13 annual report, the University of

27   Notre Dame "officially joined the ACC on July 1, 2013 … Notre Dame will compete as a full

28

member in all conference sponsored sports with the exception of football, which will play five games annually against league programs."

51.    Defendant ACC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Class Members, and will continue to damage Class Members unless enjoined.

52.    Defendants Pac-12, Big Ten, Big 12, SEC, and ACC are collectively referred to herein as the "Power Five Conference Defendants" or "Conference Defendants," and these conferences are referred to collectively in this Complaint as the "Power Five" or "Power Five Conferences."

53.    Whenever in this Complaint Plaintiff make reference to any act, deed, or transaction of a Defendant, the allegation means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the Defendant's business or affairs.

C.    **Co-Conspirators**

54.    Various persons, firms, corporations, organizations and other business entities, some unknown and others known, have participated as unnamed co-conspirators in the violations alleged herein, including the NCAA's member-schools and other NCAA Division I athletic conferences not named as defendants in this Complaint. Representatives of those schools and conferences serve on NCAA committees which promulgate rule changes. Representatives of those schools and conferences voted to adopt the rules prohibiting NIL compensation and thus agreed to impose the restraint on trade described herein. All Division I schools and conferences continue to benefit from those restraints of trade by virtue of their agreement to abide by the restraints.

## IV.    THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION

55.    Plaintiff brings this suit to challenge the NCAA restraints that prohibit, cap, or otherwise limit the compensation that Division I student-athletes may receive for the use of his name, image, likeness, and athletic reputation in the manners discussed in this Complaint. These restraints are effectuated through the NCAA's rules, regulations, and interpretations which collectively

prohibit Division I athletes from receiving any compensation based on their athletic skills or ability. Some of the specific bylaws that create the restraints are discussed below.

56. The NCAA prohibits student-athletes from endorsing any commercial product or service while they are in school, regardless of whether or not they receive any compensation for doing so. Bylaw 12.5.2.1 ("Advertisements and Promotions After Becoming a Student-Athlete") states:

> After becoming a student-athlete, an individual shall not be eligible for participation in intercollegiate athletics if the individual:
>
> (a) Accepts any remuneration for or permits the use of his or her name or picture to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind; or
>
> (b) Receives remuneration for endorsing a commercial product or service through the individual's use of such product or service.

57. The NCAA also burdens student-athletes with the responsibility of policing any commercial uses of their NILs that take place without their knowledge or permission. Bylaw 12.5.2.2 ("Use of a Student-Athlete's Name or Picture Without Knowledge or Permission") states:

> If a student-athlete's name or picture appears on commercial items (e.g., T-shirts, sweatshirts, serving trays, playing cards, posters) or is used to promote a commercial product sold by an individual or agency without the student-athlete's knowledge or permission, the student-athlete (or the institution acting on behalf of the student-athlete) is required to take steps to stop such an activity in order to retain his or her eligibility for intercollegiate athletics.

58. NCAA rules further restrict student-athletes' outside employment and the compensation that they may receive from employers. The NCAA *allows* student-athletes to obtain outside employment while attending college and participating in NCAA sports. And they even permit multi-sport athletes to retain their college eligibility in one sport while simultaneously competing (and receiving a salary) as a professional in a different sport.[21] However, the NCAA restricts virtually all NIL-related opportunities and compensation that athletes can obtain through outside employment.

---

[21] NCAA Bylaw 12.1.3.

59.     While a student-athlete may generally earn money from any "on- or off-campus employment" unrelated to his or her athletic ability, Bylaw 12.4.1 ("Criteria Governing Compensation to Student-Athletes") limits the remuneration that athletes can receive from outside employers to "a rate commensurate with the going rate in that locality for similar services." And Bylaw 12.4.1.1 ("Athletics Reputation") specifically prohibits athletes from receiving "any remuneration for value or utility that the student-athlete may have for the employer because of the publicity, reputation, fame or personal following that he or she has obtained because of athletics ability."

60.     Bylaw 12.4.2.3 ("Athletics Equipment Sales") instructs, for example: "a student-athlete may not be employed to sell equipment related to the student-athlete's sport if his or her name, picture or athletics reputation is used to advertise or promote the product, the job or the employer. If the student-athlete's name, picture or athletics reputation is not used for advertising or promotion, the student-athlete may be employed in a legitimate sales position, provided he or she is reimbursed at an hourly rate or set salary in the same manner as any nonathlete salesperson."

61.     The NCAA also restricts the NIL-related compensation that athletes can obtain through self-employment and personal business ventures. Bylaw 12.4.4 ("Self-Employment") states that "a student-athlete may establish his or her own business, provided the student-athlete's name, photograph, appearance or athletics reputation are not used to promote the business."

62.     Any Division I school that deviates from these rules is subject to severe sanctions. Potential punishments for rules violations include a complete ban on football participation (the "death penalty"), as well as a reduction in the number of grants-in-aid a school can offer, or even expulsion from the NCAA.

## V.     RELEVANT MARKET

63.     The relevant market is the nationwide market for the labor of NCAA Division I college athletes. In this market, current and prospective athletes compete for roster spots on Division I athletic teams. NCAA Division I member institutions compete to recruit and retain the best players by offering unique bundles of goods and services including scholarships to cover the cost of attendance, tutoring, and academic support services, as well as access to state-of-the-art athletic

training facilities, premier coaching, medical treatment, and opportunities to compete at the highest level of college sports, often in front of large crowds and television audiences. In exchange, student-athletes must provide their athletic services and acquiesce in the use of their NILs by the NCAA and its members for commercial and promotional purposes. They also implicitly agree to pay any costs of attending college and participating in intercollegiate athletics that are not covered by their scholarships.

64.     The Division I Labor Market includes all of the colleges and universities in NCAA Division I, which the NCAA itself defines as the highest level of competition in college sports. This includes all colleges and universities that are members of the Power Five Conference Defendants, as well as the schools and conferences they collude with through NCAA agreements to fix the maximum price paid to student-athletes in exchange for the commercial use of their NILs.

65.     The NCAA and its members have the ability to control price and exclude competition in this market. All NCAA members have agreed to utilize and abide by the NCAA's bylaws, including the provisions detailed herein, which have been used by the NCAA and its members to fix the prices at which student-athletes are paid for their commercial licensing rights, including but not limited to individual and group licensing rights, and/or to foreclose student-athletes from exercising any such rights entirely. The NCAA and its members have the power to exclude from this market any member who is found to violate its rules.

66.     The NCAA imposes a wide variety of conditions on student-athletes. For example, athletes may not receive compensation beyond educational expenses approved by the NCAA; they may not retain an agent for exploitation of their future professional career; they must meet minimum requirements for educational progress; and they are strictly limited in their ability to receive compensation for any services that might be understood to reflect on their athletic ability or reputation. If student-athletes had the opportunity to receive a college education and compete at an elite level of intercollegiate competition without these restrictions, many would choose to do so. The fact that they agree to these conditions demonstrates the market power of the NCAA and its members.

1   67. There are no reasonable substitutes for the educational and athletic opportunities

2 offered by NCAA Division I schools. No other division or association of collegiate athletics provides

3 the same combination of goods and services offered in Division I. Schools in NCAA Divisions II and

4 III provide fewer scholarships than Division I schools, which results in a lower level of athletic

5 competition. The National Intercollegiate Athletic Association (NAIA), National Junior College

6 Athletic Association (NCCAA), and United States Collegiate Athletic Association (USCAA)

7 likewise provide less scholarships and offer a lower level of competition. And schools in these other

8 divisions and associations are often smaller than Division I schools, spend far less resources on

9 athletics, and many do not even provide the opportunity to attend a four-year college. Nor are

10 equivalent opportunities offered by the professional leagues. Neither the National Football League

11 (NFL) nor the National Basketball Association (NBA) permits players to enter the league

12 immediately after high school. And, although some minor leagues and professional leagues in other

13 sports do permit athletes to join immediately after high school, recruits rarely forego opportunities to

14 play Division I sports in order to play professionally. The qualitative differences between the

15 opportunities offered in NCAA Division I and those offered by other divisions and sports leagues

16 illustrate that Division I schools operate in a distinct market.

17   68. Because Division I schools are the only suppliers in this market, they have the power,

18 when acting in concert through the NCAA and its conferences, to fix the price of their product. They

19 have chosen to exercise this power by forming an agreement to charge every recruit the same price—

20 athletic services plus the exclusive right to use the players' name, image, and likeness—for the

21 bundle of educational and athletic opportunities they offer. If any school seeks to lower this fixed

22 price, by offering recruits the opportunity to monetize their NIL, for example, that school may be

23 subject to sanctions or expulsion by the NCAA.

24   69. This agreement is anticompetitive because, among other things, it undermines

25 schools' efforts to compete freely for the best college recruits. Absent these nationwide restraints,

26 Division I conferences and schools would compete amongst each other by allowing their athletes to

27 take advantage of opportunities to utilize, license, and profit from their NILs in commercial business

28 ventures and promotional activities and to share in the conferences' and schools' commercial

CLASS ACTION COMPLAINT   - 21 -

benefits received from exploiting student-athletes names, images, and likenesses. Conferences and schools would also compete for recruits by redirecting money that they currently spend on extravagant facilities and coaching salaries to marketing programs and educational resources designed to help their student-athletes develop and grow their personal brand value.

70.     The resulting harm to student-athletes from the restraints is obvious. Many college athletes have created significant value in their NILs and, absent the challenged restraints, would receive compensation for their use in an open market. Under the current rules, these young men and women—often from socio-economically disadvantages backgrounds—are deprived of the economic benefit the market would otherwise pay for their property. The harm is exacerbated by the fact that only a small percentage of college athletes will ever play professionally. And although this fact is often touted by the NCAA as a justification for not compensating them, it highlights that for most student-athletes, college is when their NIL is most valuable.

71.     While the current rules allow, and in fact require, student-athletes to participate in the promotion of NCAA sports through use of their NILs in advertising and interaction with the community of sports consumers, donors, and media, the NCAA and its members reap 100 percent of the financial benefits of such promotion. For example, while student-athletes are strictly prohibited from doing so, the NCAA and its members realize significant benefits by entering into licensing, marketing, sponsorship, advertising, broadcast, and other commercial agreements that involve the use of student-athlete NILs. Absent the restraints, student-athletes would compete freely amongst themselves, and with the NCAA and its members to obtain endorsement, sponsorship, and other licensing deals as well as payments for promotional activities (*i.e.*, personal appearances, autographs).

72.     The NCAA's "zero compensation" policy for the use of student-athletes' NILs is not necessary to achieve the NCAA's purported goals of promoting consumer demand for college sports by maintaining a distinction between college and professional sports, or treating student-athletes in the same manner as the student body in general, or for any legitimate, procompetitive purpose.

73.     Moreover, to the extent that any procompetitive purposes are served by the rules (they are not), reasonable and less restrictive alternatives are available. For example, the NCAA could

permit schools to allow their athletes to receive compensation from third parties or compensation for the non-game-related use of their NILs in commercial activities including, but not limited to: business promotions, autograph signings, social media advertising and content creation, product endorsements, licensed merchandise sales, personal appearances, books, and movies.

74.     The challenged restraints are entirely unique to student-athletes. There are no comparable rules restricting a non-athlete student's pursuit of career options or use of his or her name, image, likeness, or skillset. In contrast to athletes, all other students on college campuses have the freedom to use their NILs to start a business, advertise commercial products and services and to be compensated at whatever rate an employer sees fit. For example, a music student who performs in the school band is not barred from being paid more than other employees to work at a local music store, if the employer feels that the student's music skills and reputation would increase sales or traffic into the store. Nor is the same music student prevented from receiving compensation from social media websites such as Twitter or Instagram if enough fans "follow" or "subscribe to" their accounts and posts. According to Brian Freeman, CEO of HeartBeat, a company that connects brands with up-and-coming and established social media influencers, there is a huge audience for social media content related to college life and, of the 250,000 influencers working with the company, approximately 10,000 are current college students.[22]

75.     In fact, while student-athletes are strictly prohibited from receiving any compensation for their involvement in promotional social media campaigns for their schools' athletic programs, many schools employ their non-athlete students in paid positions as "campus influencers." Institutions realize that students can drive interest and engagement in a way that colleges can't and many have built student influencers into their marketing strategies. Temple University, for example, targets students on its campus who have developed large social media followings on their own personal accounts and hires them to serve as video bloggers who are paid by the school to create and post promotional videos giving campus tours, discussing topics like studying abroad, and answering

---

[22] Lindsay McKenzie, *Working with student social media influencers,* Dec. 5, 2019, INSIDE HIGHER ED, https://www.insidehighered.com/news/2019/12/05/working-student-social-media-influencers (last visited June 14, 2020).

CLASS ACTION COMPLAINT            - 23 -

questions such as "what's in my book bag" or "how to survive finals week."[23] Colorado State University recently released a YouTube channel called "A Ram's Life" that portrays life at CSU "from the eyes of students themselves."[24] The channel was created by paid student interns and features videos made by student "vloggers" who are employed by the school's social and digital media team.[25]

76.     The unfairness of the rules is further highlighted by the fact that other students are free to capitalize on college players' athletic reputations while the players themselves are barred from doing so. In 2016, it was reported that Breana Dodd, a student at the University of Tennessee and then-girlfriend of Tennessee wide receiver Josh Smith, had earned a position as a paid social media endorser for the Hershey Company after being crowned "hottest college football girlfriend of the season" by Barstool Sports.[26] At the same time, Smith himself was barred by the NCAA from securing the same kind of deal.

77.     The injuries that Plaintiff and the Class Members are incurring and will continue to incur will not be fully compensable by monetary damages. This is particularly true due to the short length of NCAA careers and the challenges in estimating and proving the total amount of monetary damages suffered by Plaintiff as a result of Defendants' unlawful conduct.

## VI.   FACTUAL ALLEGATIONS

**A.     An Overview of the NCAA**

     **1.     History and Purpose**

78.     Former NCAA Executive Director Walter Byers, in his 1995 book, *Unsportsmanlike Conduct: Exploiting College Athletes*, wrote: "[t]he first intercollegiate competition in the United

---

[23] *Id.*

[24] https://www.youtube.com/channel/UCYvSJ1wawc7RMmYKufrJSYg/about.

[25] Ashley Manweiler, *Join Our Team: #CSUSocial is Hiring a Student Vlogger*, May 18, 2020, http://social.colostate.edu/2020/05/18/join-our-team-csusocial-is-hiring-a-student-vlogger/ (last visited June 14, 2020).

[26] Josh Levin, *A College Football Player's Girlfriend Can Get Paid to Endorse Candy. Her Boyfriend Can't.*, Slate.com, May 5, 2016, https://slate.com/culture/2016/05/breana-dodd-can-get-paid-to-endorse-candy-her-boyfriend-college-football-player-josh-smith-cant.html (last visited June 14, 2020).

States was conceived and organized by students in the mid-1840s. By the turn of the century, eastern colleges were competing in some 19 sports. This all came about through student initiative and effort. The students set in place the underlying structure for college sports. Today, professional coaches, professional managers and money-minded presidents have total control. It is time to give back to the students who play sports the freedoms they deserve. At a minimum, they are entitled to freedoms enjoyed by their fellow students."

79.     The NCAA "was founded in 1906 to protect young people from the dangerous and exploitative athletics practices of the time."[27] According to the NCAA, "[t]he rugged nature of early-day football, typified by mass formations and gang tackling, resulted in numerous injuries and deaths," prompting President Theodore Roosevelt to convene two White House conferences with college athletics leaders to encourage safety reforms. As a result of several subsequent meetings of colleges and universities to initiate changes in football playing rules to protect the safety of student-athletes, on March 31, 1906, 62 institutions became charter members of the Intercollegiate Athletic Association of the United States (IAAUS). The IAAUS took its present name, the NCAA, in 1910.

80.     For several years, the NCAA was a discussion group and rules-making body, but in 1921 the first NCAA national championship was conducted:  the National Collegiate Track and Field Championships. Gradually, more rules committees were formed and more championships were created, including a basketball championship in 1939.

81.     According to the NCAA, "[a]s college athletics grew, the scope of the nation's athletics programs diverged, forcing the NCAA to create a structure that recognized varying levels of emphasis. In 1973, the Association's membership was divided into three legislative and competitive divisions—I, II and III. Five years later, Division I members voted to create subdivisions I-A and I-AA (renamed the Football Bowl Subdivision and the Football Championship Subdivision in 2007) in football." The NCAA "began administering women's athletics programs in 1980 when Divisions II and III established 10 championships for 1981-82. A year later, the historic 75th Convention

---

[27] Dan Treadway, *Why Does the NCAA Exist?*, HuffPost.com, Dec. 6, 2017, https://www.huffpost.com/entry/johnny-manziel-ncaa-eligibility_b_3020985 (last visited June 14, 2020).

adopted an extensive governance plan to include women's athletics programs, services and representation. The delegates expanded the women's championships program with the addition of 19 events, many of them Division I and National Collegiate (all division) championships."

82.     Article 1 of the NCAA Constitution states that the NCAA's basic purpose is "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports."

83.     The NCAA proclaims it is "dedicated to the well-being and lifelong success of college athletes," and "united around one goal: creating opportunities for college athletes."[28]

## 2.     Governance Structure

84.     The NCAA describes itself as an "unincorporated not-for-profit educational organization . . . through which the colleges and universities of the nation speak and act on athletic matters at the national level."[29] The NCAA proclaims it is "a voluntary association of more than 1,200 institutions, conferences, and organizations devoted to the sound administration of intercollegiate athletics in all its phases," and that "[t]hrough the NCAA, its members consider any athletics issue that crosses regional or conference lines and is national in character." According to its IRS tax returns, the NCAA's "active member institutions and voting conferences are the ultimate voice in all Association decisions."[30]

85.     The NCAA "oversees 89 championships in 23 sports," and "more than 400,000 college athletes competing in three divisions at over 1,000 colleges and universities." The NCAA website further states:

> Each member school is able to choose a level of competition that best fits its mission. Competition is offered in Division I (the largest programs that provide the most athletically related financial aid for student-athletes), Division II (limited financial aid) and Division III (no athletically related financial aid).

---

[28] 2018 IRS Form 990
[29] NCAA Consolidated Financial Statements, FY 2018 & 2019.
[30] 2018 IRS Form 990.

There are 1,066 active member schools in the NCAA membership—340 in Division I, 290 in Division II and 436 in Division III. The NCAA also contains 95 member conferences in all three divisions.    Overall membership—counting schools, conferences and related associations—is 1,273.

Division I is subdivided based on football affiliation. A total of 120 schools are members of the Football Bowl Subdivision (FBS). That subdivision is characterized by postseason play outside the NCAA structure and also by higher financial aid allocations. The second Division I subdivision is the Football Championship Subdivision, which contains 122 schools that participate in the NCAA's Division I Football Championship. The remaining 98 Division I schools do not sponsor football.

86.    According to the NCAA, "Division I offers three classes of membership: active, conference and affiliated." NCAA Constitution Article 3.02.3, titled "Membership Categories," provides:

**3.02.3.1 Active Member.**  An active member is a four-year college or university that is accredited by the appropriate regional accrediting agency and duly elected to active membership under the provisions of this article (see Constitution 3.2.3). Active members have the right to compete in NCAA championships, to vote on legislation and other issues before the Association, and to enjoy other privileges of membership designated in the constitution and bylaws of the Association.

**3.02.3.2 Member Conference.**  A member conference is a group of colleges and/or universities that conducts competition among its members and determines a conference champion in one or more sports (in which the NCAA conducts championships or for which it is responsible for providing playing rules for intercollegiate competition), duly elected to conference membership under the provisions of this article (see Constitution 3.3.3). A member conference is entitled to all of the privileges of active members except the right to compete in NCAA championships (see Constitution 3.3.2). Only those conferences that meet specific criteria as competitive and legislative bodies (see Constitution 3.02.1 and 3.02.2) and minimum standards related to size and division status are permitted to vote on legislation or other issues before the Association.

87.    The NCAA's website explains that, "[e]ach division creates its own rules governing personnel, amateurism, recruiting, eligibility, benefits, financial aid, and playing and practice seasons—consistent with the overall governing principles of the Association. Every program must affiliate its core program with one of the three divisions."

88.     The NCAA "operates through a governance structure, which empowers each division to guide and enhance their ongoing division-specific activities."[31] In Division I, the legislative system is based on conference representation and an eighteen member Board of Directors that approves legislation. The governance structure also includes an Executive Committee composed of sixteen chief executive officers that oversees association-wide issues and is charged with ensuring that each division operates consistently with the basic purposes, fundamental policies, and general principles of the NCAA.

### 3.     Bylaws and Enforcement

89.     The NCAA and its members govern themselves through the NCAA manual, which is promulgated yearly and updated quarterly. The manual contains, among other things, the NCAA's Constitution and operating Bylaws, which includes nearly five hundred pages of regulations governing all aspects of college sports.

90.     The Constitution and Bylaws were adopted—and may be amended—by votes of the NCAA membership. Article 5.2.2 ("Operating Bylaws") states that "[e]ach division may adopt legislation to be included in the operating bylaws of the Association, which provide rules and regulations not inconsistent with the provisions of the constitution and which shall include, but not be limited to, the following particulars: (a) The administration of intercollegiate athletics by members of the Association; (b) The establishment and control of NCAA championships (games, matches, meets and tournaments) and other athletics events sponsored or sanctioned by the Association; (c) The procedures for administering and enforcing the provisions of the constitution and bylaws; and (d) The adoption of rules of play and competition in the various sports, and the delegation of authority in connection with such subjects to individuals, officers or committees."

91.     The manual also contains extensive provisions requiring member schools to follow NCAA rules and providing for discipline of members that fail to do so. For example, Article 1.3.2 ("Obligations of Member Institutions") states that "[l]egislation governing the conduct of intercollegiate athletics programs of member institutions shall apply to basic athletics issues such as

---

[31] NCAA Consolidated Financial Statements, August 31, 2019 and 2018.

admissions, financial aid, eligibility and recruiting. Member institutions shall be obligated to apply and enforce this legislation . . . ." Article 2.8.1 ("Responsibility of Institution") reiterates that "[e]ach institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs," and that "[m]embers of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance."

92.    Article 3.1 ("Eligibility for Membership") reinforces that "institutions or organizations must accept and observe the principles set forth in the constitution and bylaws of the Association." And Article 3.2.1.2 ("Compliance with Association Rules") mandates that each institution "shall administer its athletics programs in accordance with the constitution, bylaws and other legislation of the Association."

93.    Similarly, Article 3.2.4 ("Conditions and Obligations of Membership") states that "[a]n active member institution agrees to administer its athletics program in accordance with the constitution, bylaws and other legislation of the Association." And, pursuant to Article 3.2.4.4 ("Certification of Eligibility/Declaration of Ineligibility"), every NCAA school "is responsible for certifying the eligibility of student-athletes under the terms of the constitution, bylaws or other legislation of the Association" and institutions are "obligated immediately to apply all applicable rules and withhold ineligible student-athletes from all intercollegiate competition." In other words, the NCAA mandates a collective boycott by all members of any athlete found to have deviated from the price-fixing activity alleged in this Complaint.

94.    To reinforce its rules, the NCAA goes even further. For example, Article 3.2.4.11 ("Discipline of Member") states that, "active members shall refrain from athletics competition with designated institutions under the provisions of the Association's enforcement procedures." To put it another way, the NCAA mandates a collective boycott by all members of any school found to have deviated from the price-fixing activity alleged in this Complaint.

95.    Article 2.8.3 ("Penalty for Noncompliance") states that "[a]n institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions as may be

determined by the Association." Article 3.2.5.1 ("Termination or Suspension") states that "[t]he membership of any active member … failing to meet the conditions and obligations of membership may be suspended, terminated or otherwise disciplined." Article 3.01.4 ("Termination or Suspension of Membership") states that "[a]ll rights and privileges of a member shall cease immediately upon termination or suspension of its membership." And, Article 3.2.5.1.1 ("Cessation of Rights and Privileges") states that "[a]ll rights and privileges of the member shall cease upon any termination or suspension of active membership."

96.     Conferences also enforce the NCAA's rules. For example, the Pac-12's 2018-19 Handbook states that "[t]he Conference is formed for the following purposes: a. To provide its members with a jointly governed body for sponsoring, supervising and regulating intercollegiate athletics as a member of the National Collegiate Athletics Association ("NCAA") in accordance with the principles, policies, constitution and bylaws of the NCAA…." The Handbook continues that "[t]he members of the Conference value: … Compliance with Conference and NCAA rules" and that "[t]he Conference may place a member on probation or suspension, or terminate its membership, by vote of at least three-fourths of all of the members of the CEO Group eligible to vote on the matter, for one or more of the following reasons: … Violating rules and regulations of the NCAA, or becoming ineligible for active membership in Division I of the NCAA, by a written determination of the NCAA; … Such disciplinary action may also include the assessment of financial penalties." It continues that "[t]he Conference is a member of the NCAA, therefore, all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding," and "[t]he rules of the National Collegiate Athletic Association shall govern all matters concerning financial aid to student-athletes except to the extent that such rules are modified by the CEO Group." All of the other conference Defendants have similar rules agreeing to abide by and enforce NCAA bylaws.

97.     In addition to controlling its members, the NCAA also regulates college athletes. Bylaw 14.01.3 ("Compliance With Other NCAA and Conference Legislation") mandates that, "to be eligible to represent an institution in intercollegiate athletics competition, a student-athlete shall be in compliance with all applicable provisions of the constitution and bylaws of the Association…" Bylaw 12.7.2 ("Student-Athlete Statement") states that each year a college athlete "shall sign a

statement in a form prescribed by the Legislative Council … related to … eligibility … financial aid, amateur status … [f]ailure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition."

**B.     The commercial nature of Division I sports**

98.     The rapid and largely unconstrained escalation of commercialization in college sports makes it increasingly difficult to justify the ever-expanding divide between student-athletes, who are compensated only with restrictive, in-kind benefits or expense reimbursement, and the business of the sports they play. This divide has eroded the value of the education that athletes receive and gives rise to high-profile violations of NCAA rules that highlight the pervasive influence of money in college sports and the lack of commitment to academics.

99.     In a January 2020 interview with ESPN, former NCAA Vice President of Championships, Mark Lewis explained the highly commercialized nature of big-time college sports: "The priority is to monetize the sport, that's taken precedence over everything else. If that's the model—and there's nothing wrong with that—then you can't expect the players to live by the same set of rules [as they did in the past]. To me, it's just a question of fairness." Lewis continued, "If you go back 30 or 40 years to all the ways pro sports tried to be financially successful and compared that to college sports, you didn't check all those boxes. There were legitimate differences … Then, you could say the focus was an academic-oriented situation. But in this drive for revenue now, the boxes line up the same. Colleges are doing everything that pro sports leagues are doing to make money. So how come you're treating the participants radically different? You can't justify it."[32]

100.     The money generated by the college sports enterprise is staggering. In 2019, the NCAA reported total revenues of $1,118,495,545.[33] And, whether through sponsorship arrangements, ticket sales, television contracts, apparel deals, merchandise sales, or increasing

---

[32] Dan Murphy, *Former NCAA executive Mark Lewis supports college players earning money*, ESPN.com, Jan. 21, 2020, https://www.espn.com/college-sports/story/_/id/28530364/former-ncaa-executive-mark-lewis-supports-college-players-earning-money (last visited June 14, 2020).

[33] NCAA Consolidated Financial Statements, August 31, 2019 and 2018.

student fees, the revenue streams for conferences and individual athletics programs are varied and robust.

101.    College sports have also proved to be highly profitable for corporate interests that find every way imaginable to market and exploit student-athletes. While corporations have fueled the massive growth of the college sports industry, their profit margins have simultaneously expanded off the backs of "amateur" college athletes.

102.    For example, television networks have capitalized on the immense profitability of the college sports machine through substantial broadcasting deals with the NCAA and its members. In 2016, CBS Sports and Turner Broadcasting signed an eight-year, $8.8 billion extension with the NCAA for broadcasting rights to the March Madness basketball tournament. In the same year, the Big Ten conference signed a six-year deal with Fox, ESPN, and CBS worth $2.64 billion.[34] That contract mirrors similar deals that the other Power Five conferences and schools have made with broadcasters to launch their own channels. In 2011, for example, the University of Texas signed a deal with ESPN worth $300 million over 20 years that created the Longhorn Network.[35]

103.    Every television deal, whether with the NCAA, its conferences, or individual programs, nets broadcasters substantial advertising revenues. With championship game ads going for $1.5 million each, corporate spending on the March Madness tournament now rivals that of the Super Bowl. It is estimated that CBS and Turner took in $1 billion from advertisements during the 2018 tournament.[36] In 2019, the University of Virginia's overtime victory over Texas Tech drew 19.6 million viewers and that game alone was reported to have generated $114 million in ad spending.[37] Despite the fact that student-athletes contribute a substantial portion of the value that

---

[34] Lev Facher, *Report: Big Ten getting $2.64 billion in new TV deal*, Indystar.com, June 20, 2016, https://www.indystar.com/story/sports/college/2016/06/20/report-espn-pay-more-than-1-billion-big-ten-footballgames/86133418/ (last visited June 14, 2020).

[35] Spencer Hall, *The Longhorn Network and ESPN Sign Texas-Sized Deal (Yeehaw!)*, SBNation.com, Jan. 19, 2011, https://www.sbnation.com/ncaa-football/2011/1/19/1944110/texas-longhorn-network-espn-sign-deal (last visited June 14, 2020).

[36] Andrew Lisa, *The Money Behind the March Madness NCAA Basketball Tournament*, finance.yahoo.com, Mar. 9, 2020, https://finance.yahoo.com/news/money-behind-march-madness-ncaa-194402803.html (last visited June 14, 2020).

[37] *Id.*

supports the massive revenues generated in these deals (through both their athletic performances and the use of their NILs), because of the challenged restraints agreed to by Defendants, student-athletes do not receive any share in those revenues apart from the limited scholarships and benefits that NCAA rules permit. Absent these restraints, student-athletes would receive the market value commensurate with what they contribute.

104.    With so many cameras pointed at college sporting events, corporations have also realized an opportunity to profit by associating their products and services with student-athletes. Because the NCAA prevents them from dealing directly with individual athletes, brands find other ways to leverage the college sports platform to their advantage, including by entering into lucrative sponsorship deals with the NCAA, conferences, schools, and coaches.

105.    The NCAA maintains an official list of "corporate champions and partners" that currently includes 18 major corporations ranging from Coca-Cola, AT&T, and Capital One to Google, Geico, and Uber. These companies gain exclusive marketing and promotional rights to all 89 NCAA championship events, including the Division I Men's Basketball Championship and Football Championships. Those rights pay dividends as each commercial or logo embedded in the NCAA's programming has the potential to reach millions. As a result, and as U.S. Senator Chris Murphy noted in his 2019 report, *Madness, Inc.*, "Everything that can be branded has been. That iconic moment where athletes climb a ladder as they cut down the nets to celebrate a berth in the Final Four or the championship? Even the ladder is sponsored."[38]

106.    The nation's largest sports apparel companies also compete for what they recognize is prime advertising real estate—college athletes whose games are broadcast for millions to see. Because NCAA prohibits them from dealing directly with the athletes, instead of the student-athletes being compensating for the use of their NILs (as would occur absent the restraints), apparel companies enter into lucrative agreements with schools and coaches instead. In 2019, Nike, Adidas, and Under Armor had secured exclusive rights to outfit 97 percent of all Division I football and

---

[38] Chris Murphy, *Madness, Inc. How Everyone is getting rich off college sports – except the players*, Mar. 28, 2019, https://www.murphy.senate.gov/download/madness-inc (last visited June 14, 2020).

basketball programs, and it was reported that, in that year alone, these three companies spent over $300 million dollars on college sponsorship contracts. Universities receive substantial sums from these sponsorships, and apparel advertising on network telecasts of college basketball games also helps, together with advertising from other sources, to support the large media rights payments to the NCAA and its members.

107.    Division I programs are now defined by the apparel company that outfits their teams. For example, the University of Michigan is a Nike school, having signed a $173.8 million dollar contract with the company in 2016. In 2017, the Ohio State University signed a 15-year, $252 million deal with Nike that included a $20 million cash signing bonus. And UCLA recently signed a record-setting deal with Under Armor worth $280 million.[39]

108.    Schools can further increase their sponsorship revenues by staying loyal to a particular brand. For example, when Clemson University signed a 10-year contract extension with Nike in 2018 that granted its athletic department more than $58 million in "apparel allowances, direct cash payouts, and royalties," the school doubled its annual payout.[40] Meanwhile, Indiana University's renewed contract with Adidas nearly doubled its payments from $3.7 million per year under its prior agreement to $6.7 million.[41]

109.    Books have been written and movies produced about the enormous influence that apparel companies have in modern world of youth and collegiate sports. At this moment, there are high school recruits whose college destinations have already been decided based on the apparel company that sponsors their youth team.

[39] *Breaking down college shoe and apparel deals,* ESPN.com, Sept. 27, 2017, http://www.espn.com/mens-collegebasketball/story/_/id/20837463/a-look-colleges-apparel-shoe-deals (last visited June 14, 2020).

[40] *Clemson's 10-year Nike Extension Doubles Value of Previous Deal*, sportsbusinessdaily.com, Aug. 6, 2018, https://www.sportsbusinessdaily.com/Daily/Issues/2018/08/06/Marketing-and-Sponsorship/Clemson-Nike.aspx (last visited June 14, 2020).

[41] Zach Osterman, *IU to get 81% hike in apparel revenue in Adidas deal*, IndyStar.com, Aug. 17, 2015, https://www.indystar.com/story/sports/college/indiana/2015/08/17/iu-adidas-extend-apparel-agreement/31887747/ (last visited June 14, 2020).

110. Over time, major apparel retailers, predominantly Nike and Adidas, have come to dominate the funding of American Amateur Union ("AAU") basketball and other youth teams and tournaments in an effort to affiliate their brands and products with the next generation of sports stars. The value companies obtain from investing in and affiliating with youth teams is derived from the opportunity it provides to create relationships with top prospects and those around them from a young age. These early relationships allow the companies to influence which colleges prospects will attend and, ultimately, which brands they will endorse if and when they go pro. The system creates a strong incentive for basketball coaches at all levels to remain loyal to a particular brand—and have their players do the same—while also continuing to recruit fresh talent on behalf of the company they affiliate with. As a result, AAU basketball has become a nationwide marketplace for the most talented young basketball players in the country and is now a recruiting battleground for college coaches and corporations alike.

111. While many factors might influence the college selected by a young athlete, there is evidence demonstrating that early affiliation with a particular brand often holds significant weight in an athlete's future decisions. Between 2003 and 2017, roughly 80 percent of five-star prospects from Nike-affiliated AAU teams went on to play for a Nike-sponsored college. And of the five-star players who ultimately reached the NBA, roughly 87 percent of those who were affiliated with Nike through youth teams and colleges, continued to endorse the company as professionals.[42]

112. In 2014, University of Louisville head basketball coach Rick Pitino criticized the system, claiming that because Louisville was sponsored by Adidas, he couldn't recruit a player from a Nike-sponsored AAU team: "Believe me, it's a very competitive thing by these shoe companies to get players. They're going out and recruiting like us, in the summertime. 'Let's get this kid into the (Nike) EYBL. Let's get this kid in the Adidas Nations.'" It's hard for coaches to resist the system,

---

[42] Chris White, *By the Numbers: Once Nike gets a five-star college recruit, he's unlikely to ever leave*, USAtoday.com, Feb. 26, 2018, https://sports.usatoday.com/2018/02/26/by-the-numbers-once-nike-gets-a-fivestar-college-recruit-hes-unlikely-to-ever-leave/ (last visited June 14, 2020).

Pitino says, because "our pockets are lined with their money."[43] Ironically, 98 percent of the income from Louisville's recent Adidas sponsorship deal went directly to Pitino. In 2015-16, Pitino was reportedly paid $1.5 million through the agreement while just $25,000 went to the program.

113.    In 2017, the FBI announced a sweeping corruption investigation that implicated Pitino along with other college coaches, as well as financial advisors, and Adidas executives in a conspiracy to pay five-star high school recruits to attend Louisville and other Adidas-sponsored universities. Three federal criminal complaints released in September 2017 detail some aspects of the corruption and exploitation that occurs in the current system when coaches, agents, and shoe companies work together to control a prospect's basketball career and business dealings for their own enrichment.

114.    According to Sonny Vaccaro, a retired Nike executive and the person many consider to be the godfather of basketball endorsement money: "Everybody is involved in this scandal. There's nobody left out. The most important person in the transaction is that high school kid … and he's the poorest of all of them. And they're all bidding on his ability to play basketball—to win championships, go to the Final Four, to sell shoes, to sell suits, to put money in investments … the universities are now co-conspirators in everything that happens… It's a willing co-conspiracy. The shoe company wants to sell shoes. The university wants to win games so they get more money from the shoe company."[44] Vaccaro acknowledges that "there's been scandals in college athletics forever. And there's been a word in college athletics forever: Amateurism. And amateurism and scandal go together."

115.    While athletes are not allowed to profit from social media activities, social media sponsorships have become a staple in negotiations of corporate partnership deals for many major college athletic programs. In addition to television deals and apparel contracts, social media plays an

---

[43] *Pitino: Shoe companies too influential*, ESPN.com, Oct. 9, 2014, https://www.espn.com/mens-college-basketball/story/_/id/11672004/rick-pitino-wants-eliminate-influence-athletic-shoe-companies-recruiting (last visited June 14, 2020).

[44] Gentry Estes, *College basketball's trap: How agents and shoe companies team up to exploit athletes*, courier-journal.com, Feb. 25, 2018, https://www.courier-journal.com/story/news/2018/02/25/college-basketball-recruiting-scandal-system-traps-players/370215002/ (last visited June 14, 2020).

1    important role in schools' quest for more revenue, providing brand exposure, fan interaction, and

2    increased awareness of events at a relatively low cost to athletic departments. A strong social media

3    presence is appealing to potential sponsors and teams can drastically increase the value of their

4    sponsorships by creating high-quality, engaging social content featuring brand logos and often

5    featuring the NILs of student-athletes.

6         116.    For example, it was reported in 2015 that the University of Southern California

7    ("USC") athletics department was sending about a dozen sponsored messages each week across each

8    of its official social media accounts including on Twitter, Facebook, Instagram, and Snapchat.



18   Fox Sports, the school's rights holder, confirmed at the time that revenue from those sponsored posts

19   was approaching the mid-six-figures annually and the report further noted that "Fox and USC have

20   seen no evidence that the presence of sponsor branding turns off Trojans' fans… it's the content in

21   the graphic that drives views, whether a sponsor is present or not."[45]

22        117.    Other Division I schools negotiate similar social media sponsorship arrangements and

23   incorporate brand logos into their own athletic posts in exchange for payment from the brands.

27        [45] Michael Smith, *Colleges find revenue stream in social media*, sportsbuisnessdaily.com, Oct.
     12, 2015, https://www.sportsbusinessdaily.com/Journal/Issues/2015/10/12/Colleges/College-social-
28   media.aspx (last visited June 14, 2020).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Sponsored post by official Twitter account of UCLA Athletics (@UCLAAthletics)



Sponsored post by official Twitter account of North Carolina State football (@PackFootball)

1
2
3
4
5
6
7
8
9
10



11          Sponsored post by official Instagram account of Mississippi State football (@hailstatefb)

12          118.    In the 2017-18 academic year, sponsorship spending on college athletic departments,

13   conferences, bowl games, and related properties totaled $1.24 billion.[46] In 2018, the Pac-12

14   conference alone generated $153.13 million—15 percent of its total revenues ($1,011.97 million)—

15   from corporate sponsorship, advertising and licensing.[47] Pac-12 schools derived similar portions of

16   their revenues from sponsorships as well. For example, in 2018, corporate sponsorships accounted

17   for 16 percent ($18.07 million) of ASU's total athletic department operating revenues ($113.64

18   million).[48]

19          119.    Flush with cash and unable to compete for athletes on the basis of financial

20   remuneration, colleges invest their revenues internally. The constant drive to win, either between

21   big-time Power Five schools or smaller programs hoping to make the jump onto the national stage,

22

23          [46] *Sponsorship spending on College Athletics to Total $1.24 billion in 2017/2018 Season*,
24   sponsorhip.com, Mar. 19, 2018, https://www.sponsorship.com/Report/2018/03/19/Sponsorship-
     Spending-On-College-Athletics-To-Total.aspx (last visited June 14, 2020).
25          [47] College Athletics Financial Information (CAFI) Database,
26   http://cafidatabase.knightcommission.org/fbs/pac-12#!quicktabs-tab-where_the_money-1 (last
     visited June 14, 2020).
27          [48] College Athletics Financial Information (CAFI) Database,
     http://cafidatabase.knightcommission.org/fbs/pac-12/arizona-state-university#!quicktabs-tab-
28   where_the_money-1 (last visited June 14, 2020).

fuels an "arms race" that has inflated staff salaries and rationalized lavish athletic facilities, among other spending intended to make the school as competitive as possible in recruiting.

120. Collegiate athletic programs invest in facilities that outshine even their most impressive professional counterparts. In 2018, for example, Clemson finished construction of a $55-million-dollar football complex complete with a miniature golf course, plunge pool, sand volleyball courts, laser tag, bowling lanes, movie theater, barber shop, and 23,000 square-foot weight room.[49] In 2019, the University of South Carolina completed its own $50-million-dollar, 110,000 square-foot football operations building which features, among other things, a music recording studio, video arcade, and 12-foot by 27-foot video display made of thirty-six 55-inch flat screen televisions.[50]

121. The college sports industry has also become increasingly lucrative for college sports administrators and coaches. The median salary for an athletic director at a Division I institution is now over $500,000 a year. Meanwhile, more than 100 coaches at Division I schools earn over $1 million per year, with the top 25 football coaches earning an average of $5.2 million annually and the top 25 basketball coaches earning an average of $3.2 million annually.[51] Today, the highest paid public employees in 41 of the 50 states are college football or basketball coaches.

122. Since 1984, the average base salary for head football coaches at public universities has grown 750 percent (adjusted for inflation). As an example, Nick Saban, head football coach at the University of Alabama, made $11 million in 2017—more than any NFL coach.[52] Mike

---

[49] Cork Gaines, *Clemson's $55 million football complex shows how swanky college football facilities have become for the top programs*, businessinsider.com, Jan. 8, 2019, https://www.businessinsider.com/photos-clemsons-football-facility-2017-10#now-check-out-the-drinking-diet-tom-brady-put-gronk-on-28 (last visited June 14, 2020).

[50] Josh Kendall, *South Carolina already reaping benefits of 'phenomenal' new football ops center*, thestate.com, Feb. 4, 2019, https://www.thestate.com/sports/college/university-of-south-carolina/usc-football/josh-kendall-blog/article225502770.html (last visited June 14, 2020).

[51] Multiple Contributors, *The perks of being a college football coach: Cars, planes, and … good behavior bonuses?*, ESPN.com, Aug. 16, 2017, https://www.espn.com/college-football/story/_/id/20176937/college-football-coaches-perks-sweeten-deals-nick-saban-dabo-swinney-jim-harbaugh-urban-meyer-jimbo-fisher-mike-leach (last visited June 14, 2020).

[52] Monte Burke, *Nick Saban Will Make $11 Million Next Football Season And He Is Worth Every Penny*, forbes.com, May 2, 2017, https://www.forbes.com/sites/monteburke/2017/05/02/nick-saban-will-make-11-million-next-football-season-and-he-is-worth-every-penny/#3b912a476403 (last visited June 14, 2020).

Krzyzewski, head basketball coach at Duke, a private university, made $8.98 million in the same year. And these figures represent just one aspect of the compensation that college coaches receive. On top of extravagant salaries, coaching contracts often include additional perks like complimentary flight time on private jets, personal cars, country club memberships, negotiated percentages of ticket sales, and six-figure performance bonuses.

123.    Unlike student-athletes, coaches also share in the revenues that their schools bring in from commercial sponsorship contracts and generate income from their own personal NIL deals including consultation contracts with apparel companies, television and radio programs, employment by or ownership of sports camps and clinics, book deals, and commercial speaking engagements.

124.    For example, between 2014 and 2017, University of Kentucky ("UK") head basketball coach John Calipari reported approximately $1.1 million in outside income on top of his $7.75 million salary from UK. The sources of this income included Calipari's personal contract with Nike, book and video royalties, and various speaking fees.[53]

125.    In 2014, Michigan State University signed an apparel deal with Nike that includes a $100,000 annual cash payment to head football coach Mel Tucker. Men's basketball coach Tom Izzo also benefits from the school's apparel deal, as well as from a separate personal contract with Nike that netted him a $50,000 signing bonus, $400,000 in annual compensation, $95,000 per year in equipment and apparel, and the opportunity to receive additional bonuses if his team wins in the post-season tournament. Izzo also receives $35,000 in outside income from his camps and clinics.[54]

126.    University of North Carolina ("UNC") basketball coach Roy Williams recently released the details of his personal contract with Nike, which paid out $250,000 in 2018. Williams's compensation from Nike is set to increase gradually over the next ten years ultimately reaching

---

[53] Linda Blackford, *UK pays Coach Cal $7.75 million a year. Here's how he makes even more.*, Kentucky.com, Oct. 12, 2017, https://www.kentucky.com/news/local/education/article178430576.html (last visited June 14, 2020).

[54] Rod Beard, *Michigan State's Nike Deal worth $34M for 10 years,* detroitnews.com, July 18, 2015, https://www.detroitnews.com/story/sports/college/michigan-state-university/2015/07/18/michigan-states-nike-deal-worth-years/30325697/ (last visited June 14, 2020).

$340,000 by 2028.[55] Four other UNC coaches also have personal service contracts with Nike. Along with Williams, Mack Brown (football), Anson Dorrance (women's soccer), Mike Fox (baseball), and Sylvia Hatchell (women's basketball) each have similar deals. UNC also has its own ten-year contract with the retailer that runs through 2028. In 2019, the school received $5.1 million in product and $3.25 million in cash from Nike.[56]

127.    While NCAA rules allow college athletes to trademark their names or slogans, they are prohibited from collecting any royalties from the use of those trademarks. Meanwhile, coaches are free to profit from the licensing of their own trademarks. For example, Clemson football coach Dabo Swinney has trademarked his own name and, in 2016, he applied to trademark the phrases "BYOG" and "Bring Your Own Guts" after a post-game interview in which he said the phrases went viral. Time Magazine reported that as part of Swinney's $3.3 million compensation package, Clemson paid him $500,000 in 2015 for the rights to market his name, image, and likeness. And, thanks to the trademarks, other parties that sell Swinney trademarked products must pay 10 percent of wholesale price to the coach for using his name, and an additional 10 percent for using BYOG or Bring Your Own Guts. The Collegiate Licensing Company, which helps manage Swinney's relationships with outside vendors, has reportedly given permission to at least 13 companies, including Nike, to sell merchandise stamped with the BYOG slogan, Swinney's name, or both.[57]

128.    While student-athletes are barred from receiving compensation for promotional appearances, schools can profit by selling "access" to their athletes to the highest bidder. For example, ESPN reported that, in 2013, Texas A&M auctioned a seat next to Heisman Trophy winner Johnny Manziel at an athletic department banquet to a booster for $20,000.[58]

---

[55] Dane Huffman, *UNC extends deals with Roy Williams, Nike, others,* bizjournals.com, Dec. 19, 2018, https://www.bizjournals.com/triangle/news/2018/12/19/unc-extends-deals-with-roy-williams-nike-others.html (last visited June 14, 2020).

[56] *Id.*

[57] Sean Gregory, *Meet Dabo Swinney®, The Clemson Coach Who Trademarked More Than His Name*, TIME.com, Jan. 8, 2016, https://time.com/4171504/dabo-swinney-clemson-coach-who-trademarked-bring-your-own-guts/ (last visited June 14, 2020).

[58] Darren Rovell, Justine Gubar, *Sources: NCAA investigating Manziel*, ESPN.com, Aug. 4, 2013, https://www.espn.com/espn/otl/story/_/id/9537999/otl-ncaa-investigating-johnny-manziel-profiting-autographs (last visited June 14, 2020).

129.    And, while student-athletes are prohibited from receiving compensation in exchange for their autographs, others remain free to profit from the sale of those same autographs without fear of penalty. In 2013, at the same time Manziel was being investigated by the NCAA for allegedly accepting money in exchange for signing autographs for memorabilia brokers, ESPN reported that independent merchandiser Aggieland Outfitters had "recently auctioned off six helmets signed by Manziel and Texas A&M's other Heisman Trophy winner, John David Crow, for $81,000."[59] At the time, NCAA Vice President Kevin Lennon acknowledged that "student-athletes are often asked for autographs from fans, but unfortunately, some individuals' sole motivation in seeking an autograph is for resale."[60]

130.    From what they wear, to where you can watch them and what advertisements come across your screen, in the modern world of big-time college sports student-athletes serve the financial interests of their colleges and the corporations that have paid well to turn them into walking billboards.

**C.      The NCAA's history of antitrust violations**

131.    Rather than permit student-athletes to engage in competition for NIL payments as the commercial nature of college sports has exploded, Defendants have combined and conspired to foreclose athletes from the market entirely. This has been, and continues to be, accomplished by Defendants jointly adopting and imposing rules that have the purpose and effect of preventing players from offering the use of their NILs in competitive markets.

132.    The NCAA has a history of violating federal antitrust law. As a result, over the years, numerous parties have brought and successfully prosecuted antitrust lawsuits against the NCAA. In each of these cases, the NCAA and its members argued that loosening their anticompetitive restraints would be the death knell of amateurism and would irreparably damage consumer demand for college

---

[59] *Id.*

[60] George Schroeder, *'No evidence' Manziel took money for autographs, A&M says*, USAToday.com, Aug. 28, 2013, https://www.usatoday.com/story/sports/ncaaf/sec/2013/08/28/johnny-manziel-suspended-for-first-half-of-texas-am-opener-vs-rice/2723767/ (last visited June 14, 2020).

sports. Yet, time and time again, the NCAA's specious claims have proven false and demand has only continued to steadily grow up through the present.

133.    In 1984, the U.S. Supreme Court ruled in *NCAA v. Board of Regents* that the NCAA had violated the Sherman Act by limiting the number of live televised football games under the media plan it adopted for the 1982-85 football seasons. In conjunction with the plan, the NCAA had announced that it would punish any member institution that abided by a competing agreement with another network to televise more games. At the Supreme Court, the NCAA decried schools freely competing to sell their broadcast rights, claiming that such activity would pose an existential threat to amateurism and consumer demand. But the Court granted injunctive relief and held that the NCAA's anticompetitive scheme unlawfully restrained the market for live broadcasts of college football games.[61] Since then, schools have engaged in such competition and generate billions of dollars in revenues as a result. And, despite the NCAA's dire predictions about the destruction of college sports, consumer demand now flourishes more than ever.

134.    In *Law v. NCAA*, the Court of Appeals for the Tenth Circuit upheld a summary judgment ruling that the NCAA's then-existing cap on part-time coaches' salaries at $16,000 per year was an unlawful restraint of trade. The NCAA opposed allowing schools to freely compete, claiming that it would be contrary to the collegiate model. The Court of Appeals held that the presence of a horizontal agreement to fix compensation was presumptively anticompetitive, and that the NCAA had failed to present even a triable issue concerning whether the salary restraint was procompetitive.[62] Today, such competition is unrestrained, assistant coaches often earn *millions*,[63] and consumer demand still flourishes.

---

[61] 468 U.S. 85, 119 (1984) (rejecting NCAA argument that restricting sale of broadcast rights was necessary "to preserve amateurism").

[62] 134 F.3d 1010, 1021 (10th Cir. 1998) (rejecting NCAA's proposed procompetitive justifications for restricting assistant coach salaries).

[63] For example, between 2009 and 2015, assistant men's basketball coaches' salaries increased by nearly 40 percent.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

135.    In *White v. NCAA*, the NCAA argued against allowing schools to freely compete by offering cost-of-attendance ("COA") scholarships, calling such scholarships "pay for play."[64] Today such competition is unrestrained, and both full COA scholarships and payments *above* COA are ubiquitous (as discussed further below, and recently confirmed by the Ninth Circuit), while consumer demand for college sports is healthier than ever.

136.    In 2009, a group of Division I male basketball and football student-athletes brought an antitrust class action—*O'Bannon v. NCAA*[65]—challenging the NCAA's rules that prevent athletes from receiving a share of the revenue from member institutions that the NCAA and its members derive from the use of student-athletes' NILs in live game broadcasts, related footage, and video games. The district court held that the challenged rules were more restrictive than necessary to achieve any legitimate procompetitive justification and thus violated the antitrust laws. The district court enjoined the NCAA from prohibiting its schools from directly paying athletes (1) full COA scholarships and (2) $5,000 per year in deferred compensation for the game-related use of their NILs, through trust funds distributable after the athletes leave school. The Ninth Circuit affirmed the liability finding and COA portion of the remedy, but held that on the particular record before the district court, plaintiffs had not shown that allowing payments directly from schools in deferred compensation for game-related NIL usage would be virtually as effective as the existing restraints in preserving "amateurism"—and thus consumer demand for college sports.[66] Since the *O'Bannon* decision, based on new evidence and recent factual developments, the district for the Northern District of California found in a decision upheld by the Ninth Circuit that the NCAA's compensation rules "'do not follow any coherent definition of amateurism.'"[67] Moreover, since *O'Bannon*, student-athletes regularly receive compensation from their schools that exceeds COA—including both

---

[64] *See* NCAA Memo. P&A in Support. Summ. J. 28, *White v. NCAA*, No. 06-cv-99 (C.D. Cal. Oct. 22, 2007, ECF No. 220).

[65] 802 F.3d 1049 (9th Cir. 2015).

[66] *See id.* at 1072-79.

[67] *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig. ("NCAA GIA")*, 958 F.3d 1239, 1249 (9th Cir. 2020) (quoting and *affirming In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1074 (N.D. Cal. 2019)).

education and non-education-related compensation—and consumer demand for college sports has continued to grow exponentially.

137.    After years of litigation following complaints filed in 2014, on May 18, 2020, the Ninth Circuit Court of Appeals upheld a decision and injunction entered by the United States District for the Northern District of California in favor of a nationwide class of college-athletes challenging NCAA-imposed caps on athletic scholarships.[68] In *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.* (hereinafter referred to as the "*NCAA GIA* litigation"), the Ninth Circuit affirmed the district court's holding that NCAA's compensation restraints—agreed to by the Defendants in this Complaint—imposed substantial anticompetitive effects in a relevant market that were not justified by procompetitive justifications, and that there were less restrictive alternatives to the rules that would be virtually as effective in serving any procompetitive purpose for them. The Ninth Circuit affirmed the district court's order enjoining the NCAA from enforcing rules that restrict education-related benefits that its member institutions may offer student-athletes.

138.    In reaching its decision in the *NCAA GIA* litigation, the Ninth Circuit held that "[a]ntitrust decisions are particularly fact-bound," the "Rule of Reason contemplate[s] case-by-case analysis" that is "inherently fact-dependent" and "evaluates dynamic market conditions and consumer preferences, and, citing *O'Bannon*, that "courts must continue to subject NCAA rules, including those governing compensation, to antitrust scrutiny."[69]

139.    In a concurrence, Ninth Circuit Chief Judge Smith wrote:

> "Student-Athletes are talented, hardworking individuals who have dedicated their young lives to excelling in specific sports. As amici describe, Student-Athletes work an average of 35–40 hours per week on athletic duties during their months-long

---

[68] *NCAA GIA*, 958 F.3d 1239.

[69] *NCAA GIA*, 958 F.3d at 1253; *see also id.* (citing "*Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 579 (1925) ('[E]ach case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and . . . opinions in those cases must be read in the light of their facts'); Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1205c3 (4th ed. 2018) ('Continuing contracts in restraint of trade,' are 'typically subject to continuing reexamination,' and 'even a judicial holding that a particular agreement is lawful does not immunize it from later suit or preclude its reexamination as circumstances change.'")).

athletic seasons, and most work similar hours during the off-season to stay competitive. At the same time, most of them do their best to succeed academically, managing to devote on average another 40 hours per week to classes and study. Nevertheless, their coaches and others in the Division 1 ecosystem make sure that Student-Athletes put athletics first, which makes it difficult for them to compete for academic success with students more focused on academics. They are often forced to miss class, to neglect their studies, and to forego courses whose schedules conflict with the sports in which they participate. In addition to lessening their chances at academic success because of the time they must devote to their sports obligations, Student-Athletes are often prevented from obtaining internships or part-time paying jobs, and, as a result, often lack both income and marketable work experience. Meanwhile, the grueling hours and physical demands of college sports carry significant health risks, such as sleep deprivation, stress, broken bones, and even potential brain damage. Despite their best efforts, however, fewer than 5% of Student-Athletes will ever play at a professional level, and most of those lucky few will stay in the pros only a few short years. In short, the college years are likely the only years when young Student-Athletes have any realistic chance of earning a significant amount of money or achieving fame as a result of their athletic skills.

For all their dedication, labor, talent, and personal sacrifice, Student-Athletes go largely uncompensated. They may receive tuition for an academic experience that they cannot take full advantage of, minimal living expenses, and some lavish perks that do nothing for their present or future financial security. However, that is not because their athletic services have little value. On the contrary, the NCAA and Division 1 universities make *billions* of dollars from ticket sales, television contracts, merchandise, and other fruits that directly flow from the labors of Student-Athletes. A number of Division 1 head football coaches take home multimillion-dollar salaries that exceed those of many NFL coaches. Moreover, contrary to the NCAA's representations about the importance of 'amateurism,' the evidence in this case shows that college sports viewership has only increased since we reduced some limitations on student-athlete compensation in *O'Bannon II*. *See* Panel Op. at 11–13.

My reaction to our application of federal antitrust law to the case of the Student-Athletes is similar Justice Alito's reaction to the majority's view in *Collins v. Virginia*, 584 U.S. ——, 138 S. Ct. 1663, 201 L.Ed.2d 9 (2018). Said he: 'An ordinary person of common sense would react to the Court's decision the way Mr. Bumble famously responded when told about a legal rule that did not comport with the reality of everyday life. If that is the law, he exclaimed, 'the law is a ass—a idiot.'' *Id.* at 1681 (Alito, J., dissenting) (quoting C. Dickens, *Oliver Twist* 277 (1867)).

The treatment of Student-Athletes is not the result of free market competition. To the contrary, it is the result of a cartel of buyers acting in concert to artificially depress the price that sellers could otherwise receive for their services. Our antitrust laws were originally meant to prohibit exactly this sort of distortion."

1

**D.      The challenged restraints are not necessary to serve any purported procompetitive purpose.**

2

3
        140.    The NCAA's prohibition on student-athletes receiving compensation for use of their

4
NILs is unnecessary to further any purported procompetitive purpose.

5
                **1.      The restraints are not necessary to preserve consumer demand for college sports.**

6
        141.    In the *NCAA GIA* litigation, discussed *supra*, the District Court for the Northern

7
District of California held that, based on the evidence before the court, certain NCAA restrictions on

8
student-athlete compensation paid by schools may have a limited procompetitive effect to the extent

9
that they preserve consumer demand by supporting the distinct character and product of college

10
sports and maintain a line of demarcation between intercollegiate athletics and professional sports.

11
The Court described the difference between college and pro sports that it found may relate to

12
consumer demand as follows: "In addition to the fact that college sports are played by students

13
actually attending the college, student-athletes are not paid the very large salaries that characterize

the professional sports leagues."[70]

14
        142.    The NCAA could eliminate its restrictions on student-athletes' rights to

15
commercialize their own names, images, and likeness without harming consumer demand. To begin

16
with, the Plaintiff here requests only the freedom to seek the commercial benefits that use of his own

17
NIL may generate. Compensation for NILs is entirely different from the professional-type salaries

18
contemplated by the court in the *NCAA GIA* litigation. Unlike such salaries, NIL compensation does

19
not involve "pay for play" or otherwise undermine the "amateur nature" of college athletics.

20
        143.    Moreover, recent public opinion surveys demonstrate that fans support student-

21
athletes being able to profit from the use of their NILs, and thus that consumer demand would not be

22
negatively affected if Defendants' anticompetitive NIL restraints were eliminated. Indeed, the

23
growing public sentiment in support of student-athlete NIL rights indicates that the lifting of these

24
restraints would actually improve fan interest in college sports.

25

26

27

28
        [70] *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1082.

144.    In September 2019, CollegePulse surveyed 2,500 college undergraduate students: 84 percent of the respondents believed that the NCAA takes advantage of college athletes, 80 percent supported athletes being compensated when their NIL is used to sell video games or merchandise, and 77 percent said athletes should be able to individually profit off their NILs.[71]

145.    In December 2019, the Associated Press polled 1,053 American adults: 66 percent of respondents supported allowing athletes to earn money from the use of their NILs.[72]

146.    The results of a November 2019 Turnkey Sports Poll of more than 2,000 senior-level sports industry executives similarly indicated that consumer demand for intercollegiate athletics will not suffer if college athletes are permitted to monetize their NILs. Only 14 percent of the respondents in that study opined that allowing student-athletes to benefit from their NILs would have a negative effect on fan interest, while 45 percent indicated that such a change would have "no impact" on fan interest, and 35 percent believed it would actually positively impact fan interest.[73] These recent survey results indicate that if student-athletes were allowed to monetize and profit from their own NILs it would likely increase fan interest in, and consumer demand for, college sports.

147.    More broadly, survey evidence presented by the plaintiffs in the *NCAA GIA* litigation "tested [consumer] behavior and found that consumers would continue to view or attend college athletics (at the same rate) even if eight types of compensation that the NCAA currently prohibits or limits were individually implemented."[74] In fact, the survey results indicated that consumers would tend to watch or attend *more* college sports events if athletes were treated more fairly by being provided with additional compensation that the NCAA rules currently prohibit.

---

[71] *8 in 10 College Students Say the NCAA Takes Advantage of Athletes*, collegepulse.com, Sept. 11, 2019, https://collegepulse.com/2019/09/college-students-say-the-ncaa-takes-advantage-of-athletes.html (last visited June 14, 2020).

[72] Michael T. Nietzel, *Americans Now Overwhelmingly Support College Athletes Earning Endorsement and Sponsorship Money*, forbes.com, Feb. 11, 2020, https://www.forbes.com/sites/michaeltnietzel/2020/02/11/americans-now-overwhelmingly-support-college-athletes-earning-endorsement-and-sponsorship-money/#3299f721648e (last visited June 14, 2020).

[73] Michael Smith, Liz Mullen, *College Sports: Sharper Resolution*, sportsbusinessdaily.com, Dec. 2, 2019, https://www.sportsbusinessdaily.com/Journal/Issues/2019/12/02/In-Depth/NIL.aspx (last visited June 14, 2020).

[74] *See NCAA GIA*, 958 F.3d at 1250 (discussing evidence presented to district court).

148.    Indeed, the NCAA itself acknowledged in its April 17, 2020 Final Report and Recommendations that "allowing such compensation for some promotional or commercial activities can likely be accommodated in a manner consistent with the NCAA's model of amateur intercollegiate competition."[75]

149.    Moreover, compensation for NILs would be *more* firmly on the "amateur" side of the line than the athletic scholarships and other forms of compensation that are currently sanctioned by the NCAA and more closely resemble "pay-for-play," and which have not reduced consumer demand. Student-athletes are already permitted to receive various forms of non-education-related compensation ranging from a few hundred dollars to seven-figure amounts. For example, football players can receive up to $550 in gifts for playing in post-season bowl games. Tennis players can earn up to $10,000 a year in prize money. Olympic athletes can earn hundreds of thousands of dollars for winning medals (in one case, a University of Texas swimmer earned $740,000 from Singapore for winning an Olympic gold medal). And schools have paid tens of thousands of dollars for loss of value insurance policies to entice elite athletes to stay and compete in college without risking loss of professional earnings due to injury.

150.    The Ninth Circuit in the *NCAA GIA* litigation affirmed that the record in the case supported the district court's findings that NCAA rules "permit a wide range of above-[cost-of-attendance] payments—both related and unrelated to education. Without losing their eligibility, student-athletes may receive, for instance: (i) awards valued at several hundred dollars for athletic performance ('athletic participation awards')[,] which may take the form of Visa gift cards; (ii) disbursements—sometimes thousands of dollars—from the NCAA's Student Assistance Fund ("SAF") and Academic Enhancement Fund ('AEF') for a variety of purposes, such as academic achievement or graduation awards, school supplies, tutoring, study-abroad expenses, post-eligibility financial aid, health and safety expenses, clothing, travel, 'personal or family expenses,' loss-of-

---

[75] NCAA Federal and State Legislation Working Group Final Report and Recommendations, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf (last visited June 14, 2020).

value insurance policies, car repair, personal legal services, parking tickets, and magazine subscriptions[;] (iii) cash stipends of several thousands of dollars calculated to cover costs of attendance beyond the fixed costs of tuition, room and board, and books, but used wholly at the student-athlete's discretion[;] (iv) mandatory medical care (available for at least two years after the athlete graduates) for an athletics-related injury; (v) unlimited meals and snacks; (vi) reimbursements for expenses incurred by student-athletes' significant others and children to attend certain athletic competitions; and (vii) a $30 per diem for 'unitemized incidental expenses during travel and practice' for championship events."[76] The Ninth Circuit's decision explained that "[t]he record indicates that the NCAA does little to regulate or monitor the use of these funds" from the "Student Assistance Fund" or "Academic Enhancement Fund."[77]

151.    Indeed, in the past five years the NCAA has carved out many exceptions allowing for additional payments to student-athletes—both education and non-education related—beyond the cost of attendance. For example, before 2015, athletic participation awards did not take the form of cash-equivalent Visa gift cards. And when the NCAA changed its rules to allow full COA scholarships in August 2015, the number of student-athletes receiving above-COA payments, such as cash stipends, Pell Grants, and AEF and SAF distributions, increased significantly. This expansion of above-COA payments has not coincided with any decline in consumer demand for intercollegiate athletics. To the contrary, demand for college sports has only risen as demonstrated by the consistent and ever-growing revenues brought in by Division I basketball and FBS football. Thus, the current factual record shows that non-educational payments to student-athletes in excess of COA are no longer a "quantum leap" from NCAA practice, as the court held it would be at the time of *O'Bannon*.[78]

152.    Two-sport athletes have also received million-dollar payments as professionals in one sport while retaining NCAA eligibility in another. For example, in 2018, Kyler Murray signed a $9 million dollar contract to play baseball for the Oakland A's while he was still playing football at the University of Oklahoma. If such compensation does not implicate "pay-for-play" or otherwise

---

[76] *NCAA GIA*, 958 F.3d at 1244-45.
[77] *Id.* at 1245.
[78] *Id.* at 1255 (quoting and citing *O'Bannon*, 802 F.3d at 1078).

undermine the distinction between college and professional, it is hard to imagine how compensation for NIL rights would do so. And again, all these forms of compensation have been permitted, and consumer demand for college sports has only increased.

153.    Moreover, allowing NIL compensation would not affect consumer demand for college sports to the extent that such demand is "driven by consumers' perception that student-athletes are students."[79] Plaintiff does not challenge any of the NCAA's existing rules and regulations that require college athletes to be students in good standing at their respective schools. And if athletes were allowed to capitalize on their NILs while in college, schools would provide educational resources and programs designed to help their athletes learn about personal brand management and athletes would gain access to new academic opportunities to develop marketing skills. That is in keeping with the NCAA's purported objective to help student-athletes prepare for life after college, which for the vast majority of them does not include a professional sports career.

154.    The district court in the *NCAA GIA* litigation relied on testimony by the NCAA's and conferences' own witnesses that consumer demand for Division I basketball and FBS football is actually driven by consumers' perception that student-athletes are, in fact, students. For example, University of Wisconsin-Madison Chancellor Rebecca Blank testified that fans of college sports "love seeing their fellow students out there playing" and that viewership of college sports is based on student-athletes being "students at the university." Eugene Smith, athletic director at the Ohio State University, testified to a similar point and explained the "collegiate fan is more aligned to the educational experience that college sports provide." AAC Commissioner and former CBS/ESPN executive, Michael Aresco, noted that the programming of televised college sports focuses on "the college experience," which includes the campus, academics, and community service.[80] The district court concluded (and the Ninth Circuit affirmed on appeal) that this testimony did not support, but rather undermined, the NCAA's justification for its compensation rules because, in the absence of

---

[79] *See In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1105.
[80] *Id.* at 1082.

those rules, college athletes would still be students.[81] Such testimony similarly suggests that the restraints challenged in this Complaint are not necessary to preserve consumer demand for college sports. Absent the challenged NIL rules, college athletes would remain students and "fellow students, alumni, and neighbors of the schools would continue to identify with them."[82]

155.    Critics of a system that permits NIL compensation have expressed fears that it will be abused as a recruiting tool or transformed into a disguised form of "pay-for-play." But comparable abuses already exist in college athletics, as evidenced by the recent FBI probe into corruptive recruiting practices in numerous Division I basketball programs. In 2017, allegations surfaced that coaches were working with agents, sneaker company executives and financial advisors to steer players to their schools in exchange for large sums of cash. The investigation ultimately cost Hall of Fame coach Rick Pitino his job and led to the arrests of three Adidas executives, a financial advisor, an AAU coach, a former sports agent, and several college assistant coaches.

156.    Moreover, to the extent that the purported procompetitive purpose of promoting consumer demand is served by the rules at all (it is not), there are reasonable and less restrictive alternatives available. For example, an injunction could permit athletes to receive compensation only from third parties, or only for non-game-related uses of their NILs in commercial activities including, but not limited to: business promotions, autograph signings, social media, product endorsements, licensed merchandise sales, personal appearances, books, and movies. In *O'Bannon*, the Ninth Circuit distinguished prize award money allowed for tennis recruits from the payments sought by the plaintiffs finding that "award money from outside athletic events implicates amateurism different than allowing schools to pay student-tennis players directly."[83] Thus, while recent factual developments show that no NIL restrictions are necessary to preserve consumer demand for college sports, NIL payments from third parties are even further removed from any type of payments that arguably could impact such demand.

---

[81] *Id.*

[82] *Id.*

[83] *Id.* at 1077 n.21.

CLASS ACTION COMPLAINT                    - 53 -

157.    Fears about potential abuses of a system should not be conflated with fears of the system itself, nor do they justify blanket restrictions on a free market.

**a.    Any procompetitive justification based on consumer demand for college sports is also irrelevant because it concerns an entirely different market.**

158.    As explained *supra*, Defendants' restraints have anticompetitive effects in the Division I Labor Market. The purported procompetitive justifications, on the other hand, concern an entirely separate and distinct market and are therefore irrelevant for antitrust analysis in this case.

159.    The purported procompetitive benefit relied upon most heavily by Defendants in recent antitrust litigation challenging NCAA compensation restraints is the claim that such restraints are necessary to preserve consumer demand for college sports. But, even if the challenged restraints did have some positive effect on consumer demand—they do not—those benefits would relate to the consumer market for college sports, which is distinct from the relevant market here that is directly impacted by Defendants' rules.

160.    The Ninth Circuit in the *NCAA GIA* litigation, explained that "[i]t is not settled" whether courts may "consider a restraint's procompetitive benefits in a market outside the market deemed relevant for the purpose of evaluating a restraint's anticompetitive effects."[84] Because the issue was not raised by parties in that case, it was not addressed by the Court either.[85] But, concurring in the decision, Chief Judge Smith wrote that "the underlying purpose of the Sherman Act—promoting competition—counsels in favor of conducting a more limited Rule of Reason analysis," confined to the market that is being restrained. "If the purpose of the Rule of Reason is to determine whether a restraint is net procompetitive or net anticompetitive, accepting procompetitive effects in a collateral market disrupts that balancing. It weakens antitrust protections by permitting defendants to rely on a broader array of justifications that promote competition, if at all, in collateral markets where the restraint under analysis does not occur."[86]

---

[84] *NCAA GIA*, 958 F.3d at 1257.

[85] *Id.*

[86] *Id.* at 1269 (Smith, C.J., concurring).

1

2.       **Education and NIL compensation are not mutually exclusive.**

2        161.    The NCAA, in other litigation, has also argued that its compensation rules somehow

3    promote the integration of student-athletes with their academic communities and that payments for

4    NILs or compensation based on athletic performance would "create a wedge" between student-

5    athletes and the student body at large. The NCAA has further claimed that the "chase for

6    endorsements" could interfere with student-athletes' focus on education.

7        162.    To begin with, this paternalistic rationale does not constitute a legitimate

8    procompetitive justification for a sweeping market restraint on adult student-athletes being able to

9    commercially benefit from their own names, images, and likenesses.

10       163.    Moreover, in *O'Bannon*, the Court held that this purported goal is better achieved by

11   other NCAA rules, such as those requiring athletes to attend class or forbidding more than a certain

12   number of practice hours per week.[87] And, while the Court acknowledged the NCAA may have some

13   interest in preventing a social "wedge" between athletes and the rest of the student body, it held that,

14   "it does not justify a total, 'sweeping prohibition' on paying student-athletes for the use of their

15   NILs."[88]

16       164.    For one, income disparities already exist on college campuses as a result of family

17   background and wealth derived from other sources. And, despite the existing disparities, there is no

18   evidence that students with more financial resources are negatively impacted in terms of their

19   integration with peers or the quality of education they receive.

20       165.    The ability to take advantage of NIL opportunities and related compensation would

21   enhance, not detract from, the integration and academic experiences of college athletes. Education

22   and pay are not mutually exclusive and are, in fact, pursued simultaneously by millions of college

23   students across America.

24       166.    In the *NCAA GIA* litigation, the district court rejected the NCAA's so-called

25   "academic integration" and "wedge" arguments,[89] and its finding was not challenged by the NCAA

26   _____

[87] 802 F.3d at 1061.

27   [88] *Id.* at 1060.

28   [89] *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1083-86.

on appeal. Moreover, as explained above, the Ninth Circuit found a wealth of evidence showing that NCAA rules already permit student-athletes to receive numerous above-COA payments "related and unrelated to education."

167.    The NIL restrictions do not promote integration and in fact create a significant divide between the rights enjoyed by purely academic students and those allowed to athletes. The NCAA itself has acknowledged that "the current rules preclude student-athletes from engaging in a wide range of promotional activities that are open to college students generally, a situation that is inconsistent with the NCAA's goal of treating student-athletes in the same manner as the student-body in general."[90] Non-athlete students are free to exploit the full potential of their NIL rights while student-athletes are forced to forego any NIL compensation whatsoever under the NCAA's complicated system of regulations. Allowing student-athletes to monetize their NILs would increase the validity of the NCAA's claim that student-athletes are "students first" by treating athletes more like their peers.

168.    Plaintiff does not challenge the NCAA's existing rules and regulations that require them to be students in good standing at their respective schools or that require athletes to meet certain academic standards to remain eligible for competition. Moreover, if athletes were allowed to capitalize on their NILs while in school, schools would provide additional educational resources and programs designed to help athletes learn about marketing and personal brand management and athletes would gain access to new opportunities to develop marketing skills.

### 3.    The NIL restrictions do not prevent exploitation—they are exploitative.

169.    The NCAA has also previously argued that the elimination of its NIL restrictions would lead to "over-commercialization, which transposes the collegiate model into a system that more closely resembles the professional sports approach." In particular, the NCAA has asserted that its no-endorsement rules "prevent students from becoming billboards for commercialism."

---

[90] NCAA Federal and State Legislation Working Group Final Report and Recommendations (Apr. 17, 2020), https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf (last visited June 14, 2020).

170. To begin with, this supposed rationale does not constitute a legitimate procompetitive justification for a sweeping market restraint on adult student-athletes being able to commercially benefit from their own names, images, and likenesses.

171. Moreover, in a system where billions of dollars are generated primarily off the backs (literally, when sponsor pay to outfit student-athletes with branded equipment and apparel) and athletic successes of student-athletes, the restrictions on NIL compensation do not prevent exploitation—they are exploitative. As explained above, whatever downside comes from commercialization is already impacting college athletes; the current rules merely ensure they have a limited share in the benefits from such commercialization. The unfairness in this arrangement grows exponentially with each new multi-million (or multi-billion) dollar television and sponsorship deal, coaching contract, and facility construction, while the selective and blanket restrictions on student-athletes are maintained. As it stands, the current system does far more to advance the financial interests of the NCAA, broadcasters, corporations, and athletic departments than it does for the student-athletes who provide the product from which everyone else profits.

172. John Shoop, former offensive coordinator for the University of North Carolina football team described his first-hand perspective of the inequities of this system in a 2018 documentary: "I know people say these players get everything. No they don't get everything. What they get is a facility that might have a barbershop in it, tons of flat screen TVs, they might get a bunch of Nike spikes. At this time in their life, when they really did have incredible value, I was the one absorbing all that value, not them. That didn't feel good to me. I was the one getting paid a lot, not them. For some of these young men, these are the four years where their earning potential is higher than it's ever been. This is it. When they graduate, they're done… They're propelling a billion dollar industry right here and they're getting a sweat suit for it."[91]

173. The harm to student-athletes is exacerbated because only a small number of them will go on to play professionally. While this fact is touted by the NCAA as a justification for not

_____

[91] HBO, Student-Athlete (2018), www.hbo.com/documentaries/student-athlete (last visited June 14, 2020).

compensating athletes, it highlights that for many the college years are when their NIL is most valuable—the only time they are not allowed to benefit from it.

174.    The current restrictions also create an incentive for student-athletes, boosters, agents, third-parties, and others to violate the rules and enter into under-the-table deals. The absence of an above-the-board market thus creates an environment where exploitation is more, not less, likely. On the other hand, permitting regulated NIL payments would allow the NCAA and its members to more effectively monitor and prevent circumvention of the rules and protect student-athletes.

**E.    There is significant support for allowing athletes to receive NIL compensation and Plaintiff has been damaged by Defendants' anticompetitive restraints.**

175.    There is widespread support among college sports administrators, student-athletes, legislators, and the public at large for the concept of allowing Division I athletes to be compensated for their NILs. It is also clear that Defendants' rules prohibiting such compensation have damaged and will continue to damage athletes absent a court-imposed remedy.

**1.    California Fair Pay to Play Act and related state legislation.**

176.    State legislators are finally starting to recognize and act on the massive inequities that exist in the current college sports industry. On September 30, 2019, California became the first to open the door for college athletes in that state to monetize their NILs when Governor Gavin Newsom signed CA Senate Bill 206 ("SB 206"), dubbed the Fair Pay to Play Act. The law is set take effect in January 2023.

177.    If it goes into effect, SB 206 will essentially create an unrestricted market for student-athletes and other parties to use and profit from the use of student-athlete NILs. Under the new law, college athletes in California will be able to be make money for advertisements, sponsorships, endorsements, and signing autographs without losing their NCAA eligibility or scholarships. California student-athletes will also be able to monetize their social media accounts and use their NILs to advertise and promote their own work-product and business ventures.

178.    According to Erwin Chemerinsky, Dean of the Cal Berkeley School of Law, "this is not just about elite male athletes in football and basketball. Female athletes in particular, have a great deal to gain from SB 206 because they have far fewer opportunities to play professional sports than

male athletes. For many female athletes, college may be the only real time to achieve compensation from their talent. Moreover, if female athletes could market themselves … it likely would raise the profile of women's sports in general and provide even more opportunities for female athletes."[92]

179.    As of April 2020, 33 other states had introduced legislation similar to SB 206 addressing the topic of payments to college athletes for the use of their NIL rights.

180.    The NCAA opposes SB 206 and other similar legislative proposals claiming that they are unconstitutional and warning that they will "wipe out the distinction between college and professional athletics."[93] In a response sent to Governor Newsom in September 2019, the NCAA even went as far as threatening to ban California schools from future NCAA playoffs if the law goes into effect.

181.    Nevertheless, with political and legal pressures mounting and public opposition to the unfairness intensifying, the NCAA recently changed its official policy on student-athlete NIL compensation and, in an seeming about-face from its previous stance, now claims to be embracing the concept.

> **2.    The NCAA and its members have made statements supporting student-athletes' NIL rights, which is a stark departure from previous positions taken before federal courts.**

182.    Despite their continued enforcement of the NIL restraints, representatives of the NCAA and its member schools and conferences have made a multitude of public comments in recent years acknowledging the unfairness in the system and supporting the concept of allowing athletes to financially benefit from their NILs. That culminated in a report issued on April 29, 2020 acknowledging that student-athletes should have the right to benefit from their NILs.

183.    In 2015, NCAA Vice President for Regulatory Affairs Oliver Luck was quoted as saying, "I do believe that the name, image, likeness for an individual is a fundamental right—that

---

[92] Erwin Chemerinsky, *Colleges make lots of money off of sports. Why can't student athletes do the same?,* sacbee.com, Sept. 6, 2019, https://www.sacbee.com/opinion/california-forum/article234702882.html (last visited June 14, 2020).

[93] Members of the NCAA Board of Governors, *NCAA responds to California Senate Bill 206*, ncaa.org, Sept. 11, 2019, http://www.ncaa.org/about/resources/media-center/news/ncaa-responds-california-senate-bill-206 (last visited June 14, 2020).

1    any individual controls his or her name, image and likeness—and I don't believe that a student-

2    athlete who accepts a grant-in-aid simply waives that right to his or her name, image, likeness."[94]

3         184.     In March 2018, Mark Emmert acknowledged that the Olympic model, in which

4    athletes are permitted to obtain third-party endorsement deals and other NIL-related compensation,

5    was under consideration by the NCAA at that time, and he suggested that such a model could be a

6    viable option for intercollegiate athletics: "There's a lot of discussion about the Olympic model and I

7    think it's well deserving of serious consideration inside the context of college sports."[95]

8         185.     A 2019 CBS Sports survey of more than 100 Division I coaches revealed that 77

9    percent of the coaches polled support an Olympic-style model for college sports that allows student-

10    athletes to profit off of their NILs.[96]

11         186.     During an interview on April 24, 2020, University of Michigan athletic director,

12    Warde Manuel voiced his support for the concept of allowing student-athletes to accept NIL

13    compensation: "It's the right thing to do… I think this is good for our [student-athletes]… It allows

14    them to be considered just like any other student who would have the opportunity to profit." Manuel

15    rejected the claim, long relied upon by the NCAA to justify its restraints, that the outright ban on

16    NIL compensation is necessary to prevent the destruction of college sports: "Sometimes the doom

17    and gloom gets a bit much. We adapt, we move."[97]

18

19

---

20      [94] Steve Berkowitz, *Oliver Luck brings own perspective to NCAA on O'Bannon name and
likeness issue*, USAToday.com, Jan. 16, 2015,

21    https://www.usatoday.com/story/sports/college/2015/01/16/ncaa-convention-oliver-luck-obannon-
name-and-likeness-court-case/21873331/ (last visited June 14, 2020).

22      [95] Richard Johnson, *Here's why Mark Emmert's comment on the NCAA embracing the Olympic
mode of compensation is meaningless*, SBNation.com, Mar. 3, 2018,

23    https://www.sbnation.com/college-football/2018/3/3/17075570/mark-emmert-says-hes-open-to-

24    olympic-model (last visited June 14, 2020).

25      [96] Gary Parish, *Candid Coaches: Would you support an Olympic-style model for student-
athletes?*, cbssports.com, Sept. 3, 2019, https://www.cbssports.com/college-basketball/news/candid-
coaches-would-you-support-an-olympic-style-model-for-student-athletes/ (last visited June 14,

26    2020).

27      [97] *Michigan AD Warde Manuel for an NIL bill: 'It's the right thing to do'*, mlive.com, Apr. 27,
2020, https://www.mlive.com/wolverines/2020/04/michigan-ad-warde-manuel-for-an-nil-bill-its-the-

28    right-thing-to-do.html (last visited June 14, 2020).

CLASS ACTION COMPLAINT         - 60 -

187.     In a 2014 interview with CBS Sports, Notre Dame Athletics Director Jack Swarbrick spoke out about the inequitable effect of the existing NIL restraints: "if our standard had been what's the rule for other students, capturing name, image and likeness outside team activity, the musician at school doesn't have that limitation. I'm not sure why the student-athlete should, either… I think it would contribute to reducing so many of the problems we have which really spring from this situation we created when we say they're not going to be the same as other students."[98] Swarbrick reiterated this point as recently as April 2020, explaining that, "since regular students have the opportunity to exploit their name, image and likeness, we've always felt students who are athletes should have a version of that."[99]

188.     In October 2019, Big South conference commissioner Kyle Kallander echoed this sentiment:

> "We must provide an opportunity for student athletes to benefit from NIL. I believe it just makes common sense to allow athletes to be involved in entrepreneurship, business, modeling, online initiatives, and other activities where NIL may be a factor. Other students are taking advantage of this. Ours should as well. I'm even willing to consider some athletics-related monetization—through autograph signing, jersey sales, video games, etc. These activities can be directly tied to their individual NIL. It makes sense."[100]

189.     School officials have also expressed support for a change in the NIL restraints. Nebraska head football coach, Scott Frost, recently stated that, "regardless of what change comes in NIL legislation, we want every Nebraska athlete to be prepared with the blueprint for success beyond the field." Athletics Director Garrett Klassy further indicated that Nebraska has "no concern" about

---

[98] Ryan Ritter, *Jack Swarbrick Speaks Out on Paying Student Athletes,* herloyalsons.com, Dec. 11, 2014, https://www.herloyalsons.com/blog/2014/12/11/jack-swarbrick-speaks-paying-student-athletes/ (last visited June 14, 2020).

[99] Dennis Dodd, *What's ahead in the name, image and likeness rights debate as recommendations set to be submitted*, cbssports.com, Apr. 22, 2020. https://www.cbssports.com/college-football/news/whats-ahead-in-the-name-image-and-likeness-rights-debate-as-recommendations-set-to-be-submitted/ (last visited June 14, 2020).

[100] Brian Mull, *Big South Commissioner Discusses Name, Image, Likeness*, bigsouthsports.com, https://bigsouthsports.com/news/2019/10/30/general-big-south-commissioner-discusses-name-image-likeness.aspx (last visited June 14, 2020).

CLASS ACTION COMPLAINT                                   - 61 -

1    changes to NIL rules. "We have the most passionate fan base and sponsors in the country and we

2    fully expect them to continue to support Nebraska if NIL legislation changes."[101]

3          190.    University of Michigan head football coach, Jim Harbaugh similarly confirmed that

4    he and others in the UM athletic department "believe the name, image and likeness is a very good

5    thing. A player should have the same opportunity that a football coach has to profit off their name,

6    image and likeness… Again, not the best to have a rule that says you can't. So we're all for it. We're

7    all for name, image and likeness."[102] According to its official budget, UM received $18.4 million in

8    "corporate sponsorship" and $9.4 million in "licensing royalties" in 2019.[103]

9          191.    Ohio State basketball coach, Chris Holtmann expressed a similar sentiment: "I think

10   given the amount of money that's generated from college sports, in particular our sport the NCAA

11   tournament, and obviously we know what a profound impact college football has on the overall

12   economy of a university and a campus, I think it makes sense to allow guys, to allow athletes, men

13   and women, to profit off of this. Again, I think it's going to, just like the regular marketplace, it's

14   going to be significant for some and maybe somewhat insignificant for others. But that's also a

15   lesson as to what life is going to look like in the marketplace beyond college."[104]

16

17

18

19

20

21          [101] J. Brady McCollough, *Nebraska prepares for student-athlete branding by partnering with Opendorse*, latimes,com, Mar. 10, 2020, https://www.latimes.com/sports/story/2020-03-10/nebraska-opendorse-nil-athlete-branding (last visited June 14, 2020).

22
            [102] Clayton Sayfie, *Jim Harbaugh is 'All For' NIL proposal*, michigan.rivals.com, May 9, 2020,
23   https://michigan.rivals.com/news/jim-harbaugh-is-all-for-nil-proposal (last visited June 14, 2020).

24          [103] Zach Shaw, *Unpacking Jim Harbaugh's comments on NIL pay and NCAA amateurism*, 247sports.com, Oct. 8, 2019, https://247sports.com/college/michigan/LongFormArticle/Unpacking-
25   Michigan-football-coach-Jim-Harbaughs-comments-on-NIL-pay-NCAA-amateurism-and-the-Fair-Pay-Act-136697466/#136697466_7 (last visited June 14, 2020).

26          [104] Colin Hass-Hill, *Chris Holtmann Working Proactively Behind Scenes to use Name, Image, Likeness Reform in Recruiting for Ohio State*, elevenwarriors.com, May 6, 2020,
27   https://www.elevenwarriors.com/ohio-state-basketball/2020/05/113914/chris-holtmann-proactively-working-behind-scenes-to-use-name-image-likeness-reform-in-recruiting-for-ohio-state (last visited
28   June 14, 2020).

CLASS ACTION COMPLAINT                 - 62 -

192.    In October 2019, the NCAA announced that its governing board "voted unanimously to permit students participating in athletics the opportunity to benefit from the use of their name, image, and likeness in a manner consistent with the collegiate model."[105]

193.    The board's report concluded that "enhanced opportunities related to name, image or likeness would be an appropriate extension of efforts to modernize NCAA rules in a way that is consistent with our values and principles. We believe additional flexibility in this space can and must continue to support the collegiate model in clear contrast to the professional sports model."[106]

194.    The report continued:

> "the working group generally believes student-athletes should be permitted to use their name, image or likeness to promote their own work product or business, particularly when the work product or business is not related to athletics. Even when the work product or business is related to athletics, the working group believes sufficient controls can be developed to mitigate potential abuse, including current rules related to recruitment offers and inducements and extra benefits, and permit student-athletes to pursue opportunities in a manner consistent with the collegiate model… It is important to note that NCAA bylaws already allow for student-athletes to have outside employment and business activity. This framework of review and regulation is specific to when student-athletes wish to lend their name, image or likeness to promote a student's own enterprise or an employer's business activity, such that name, image and likeness become intertwined."

195.    On April 29, 2020, the NCAA announced its official endorsement of a broad spectrum of recommendations from the working group that would allow college athletes to be compensated by third parties for commercial use of their NILs in "third-party endorsements or social media influencer activity… social media content creation and distribution, promotion of student-athlete businesses (music, art, athletic lessons, etc.), and personal promotional activities (autograph signings, etc.)."[107]

---

[105] *Board of Governors starts process to enhance name, image and likeness opportunities*, ncaa.org, Oct. 29, 2019, http://www.ncaa.org/about/resources/media-center/news/board-governors-starts-process-enhance-name-image-and-likeness-opportunities (last visited June 14, 2020).

[106] Report of the NCAA Board of Governors October 29, 2019 Meeting, ncaa.org, https://ncaaorg.s3.amazonaws.com/committees/ncaa/exec_boardgov/Oct2019BOG_Report.pdf (last visited June 14, 2020).

[107] NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations (Apr. 17, 2020) https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf.

196.    Despite the fact that such compensation would not be tethered to educational expenses or costs incidental to college athletics participation, and could be substantial, the working group confirmed that it "has received feedback from all three divisions that illustrates allowing such compensation for promotional or commercial activities can likely be accommodated in a manner consistent with the NCAA's model of intercollegiate competition."[108]  Indeed, the report explains that allowing student-athletes to receive such compensation could actually help them "directly offset their educational costs without undermining the Association's model of intercollegiate athletics."[109]

197.    Notably, the statements by the NCAA are a complete reversal from positions it took before the federal courts, including in the *O'Bannon* case. There, the NCAA insisted before the Ninth Circuit Court of Appeals that NIL payments—no matter how small—would be "anathema to amateurism," would constitute "pay-for-play," and would "blur the clear line between amateur college sports and their professional counterparts."[110] The NCAA argued that permitting *any* NIL payments would destroy amateurism and be ruinous to consumer demand because such payments are not related to educational expenses:

> "Contrary to the [district] court's view, *amateurism is not simply a matter of the amount of any payment*. Allowing student-athletes to receive compensation for specific commercial revenue generated via use of their NILs is no less anathema to amateurism than paying football players $100 per sack."[111]

198.    But, while the NCAA now openly acknowledges that "the current rules related to NIL commercialization are in need of modernization,"[112] and has directed its three divisions to draft NIL legislative proposals that are in line with the recommendations by 2021, it remains unclear whether and what meaningful changes will actually be implemented absent a court order.

---

[108] *Id.*

[109] *Id.*

[110] *O'Bannon v. NCAA*, Nos. 14-16601 & 14-17068 (9th Cir.), Brief for NCAA at 57 (Nov. 14, 2014, ECF No. 13-1) ("NCAA *O'Bannon* Br."); NCAA Mem. P. & A. in Supp. Summ. J. 28.

[111] NCAA *O'Bannon* Br. at 57.

[112] *NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations*, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf (last visited June 14, 2020).

199.    Although the NCAA has suggested that its recent policy shift demonstrates its "willingness to respond to the evolving needs of student-athletes, and its long track record of providing remarkable opportunities for student-athletes to gain access to higher education," the NCAA's announcement makes clear that it "was primarily motivated to form the working group and charge it with reviewing the NCAA's rules regarding student-athlete NIL by proposals of state and federal legislation on this topic." The report also explicitly criticizes and downplays the positive benefits for student-athletes resulting from antitrust litigation against the NCAA, including what it terms ongoing litigation to "second guess the Division I membership," and it has proposed that the NCAA "seek an exemption from federal and state antitrust laws."[113] Indeed, while the NCAA claims to be working towards some "modernization" of the NIL rules, it is in fact actively and aggressively seeking an exemption from federal and state antitrust law that would allow it to continue its anticompetitive practices without legal repercussion.

200.    The Associated Press also reported that the Power Five athletic conferences spent at least $350,000 in the first three months of 2020 "as part of a coordinated effort to influence Congress on legislation affecting the ability of college athletes to earn endorsement money." Those expenditures came on the heels of a combined $750,000 spent on lobbying by the NCAA, ACC, and Big 12 in 2019.[114]

201.    And the Power Five conferences on May 23, 2020 sent a letter to congressional leaders, where in the context of discussing potential federal NIL-related legislation, they requested statutory immunity from certain antitrust laws and state laws protecting NIL rights.[115] In sum, while the NCAA and its members have now been forced to admit that there is no legitimate basis to exclude student-athletes from being able to commercialize their own names, images, and

---

[113] *Id.*

[114] *AP Exclusive: Power Five spend big on lobbying Congress*, collegebasketball.nbcsports.com, May 20, 2020, https://collegebasketball.nbcsports.com/2020/05/20/ap-exclusive-power-five-spend-big-on-lobbying-congress/ (last visited June 14, 2020).

[115] *See* https://twitter.com/Brett_McMurphy/status/1266411058044035075/photo/1 (last visited June 14, 2020).

likenesses—their personal property—the NCAA and its members will only make changes in a context of a deal that will protect them from liability and protect their own commercial interests.

### 3. Statements from the Knight Commission on Intercollegiate Athletics.

202. Four years ago the Knight Commission on Intercollegiate Athletics commissioned research on the topic of student-athlete NIL rights. In May 2016, Tulane law professor and Associate Provost for NCAA Compliance, Gabe Feldman presented a white paper to the Commission in which he concluded that, at very least "the non-game related NIL restrictions are unnecessary to the NCAA's core goals and may actually be counterproductive," and he recommended an NCAA rule change "to allow student-athletes to secure endorsement deals or otherwise receive compensation for use of their NILs, including value derived from their athletic ability, as long as such use is not related to their participation in the underlying athletic event or derivative of the underlying event (including broadcast, re-broadcast, etc.)."[116]

203. While limited, the Knight Commission report concluded, among other things, that the NCAA's prohibition on non-game-related NIL compensation is "not necessary to preserve the distinct character and product of amateur collegiate sports," that "education and NIL payments are not mutually exclusive," and that "the restrictions on non-game related NIL deals do not prevent exploitation—they are exploitative."[117]

204. On April 3, 2020, the Knight Commission issued a follow-up statement outlining its current position on the issue of student-athlete NIL rights:

> "The Knight Commission on Intercollegiate Athletics believes an updated model of college sports is necessary to ensure the fair treatment of college athletes and to better prioritize their education, health, safety, and success. This model must maintain the two foundational elements that distinguish college sports from professional sports: college athletes must be full-time academically eligible students and institutions must be prohibited from paying them for their athletics participation."[118]

---

[116] Gabe Feldman, *The NCAA and "Non-Game-Related" Student-Athlete Name, Image and Likeness Restrictions*, May 2016, https://www.knightcommission.org/wp-content/uploads/2008/10/feldman_nil_white_paper_may_2016.pdf (last visited June 14, 2020).

[117] *Id.*

[118] *Knight Commission on Intercollegiate Athletics Principles for New Rules on the Use of College Athletes' Name, Image and Likeness*, Apr. 3, 2020, https://www.knightcommission.org/wp-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**4.     The NCAA makes exceptions that have allowed some athletes to profit from the value of their NILs.**

205.    Since 2015, more than 200 legislative relief waivers have been submitted to the NCAA requesting to allow certain student-athletes to use and/or profit from the use of their NILs in various commercial activities. According to Atlantic 10 conference commissioner Bernadette McGlade, the NCAA has been approving waivers at a high rate to allow athletes to earn money if they want to develop a product or write a book, for example.[119] Approximately 95 percent of these waivers have been approved.[120] Since 2018, institutions have also had the flexibility to apply pre-set guidelines from a list of NCAA-approved waivers. According to the NCAA, "it is not possible to accurately account for these local waivers, but they likely significantly exceed those allowed by the NCAA."[121]

206.    According to the NCAA, the waiver process has allowed student-athletes to use their NIL to promote products or businesses in the following types of circumstances:

a.    A student-athlete was allowed to use her name and picture on a website and social media accounts to promote a clothing business that she created;

b.    A student-athlete was allowed to use his NIL to promote a company that he created to provide personalized nutrition advice for clients; and

c.    A student-athlete was allowed to use her name and photo on a website to promote a photography business that she had created (and that was named after her).[122]

207.    As another example Notre Dame women's basketball player Arike Ogunbowale was granted a waiver in 2018 that allowed her to compete on the ABC television show *Dancing with the*

content/uploads/2020/04/kcia-principles-new-rules-use-college-athletes-nil-040320-01.pdf (last visited June 14, 2020).

[119] *NCAA poised to move toward allowing athletes to make money*, CNBC.com, Oct. 28, 2019, https://www.cnbc.com/2019/10/28/ncaa-poised-to-move-toward-allowing-athletes-to-make-money.html (last visited June 14, 2020).

[120] *Name Image and Likeness: What Student-Athletes Should Know*, ncaa.org, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/2020_NILresource_SA.pdf (last visited June 14, 2020).

[121] *NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations*, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf (last visited June 14, 2020).

[122] *Id.*

CLASS ACTION COMPLAINT            - 67 -

1   *Stars* and to accept prize money from the show (contestants earn $125,000 for appearing and

2   $325,000 if they win) while remaining NCAA eligible. According to the NCAA, it made this

3   exception because it considered Ogunbowale's participation on the show to be "unrelated to her

4   basketball abilities." But it is obvious that Ogunbowale was invited specifically because of her skills

5   on the college basketball court—she was the star player of the 2018 March Madness tournament and

6   made a game-winning shot at the buzzer to win the national championship for Notre Dame. That

7   performance is what landed her on the Ellen Degeneres Show and the cover of Sports Illustrated, and

8   there is no doubt it is what earned her a spot on *DWTS*.

9   208.   These examples of student-athletes being able to profit from their own NILs,

10   including in very publicized ways such as performing on *Dancing with the Stars*, have occurred

11   while the revenue of college sports has continued to explode. Certainly then, it cannot be reasonably

12   argued that allowing other athletes to obtain similar benefits would cause a decline in consumer

13   demand.

14   **5.   Student-athletes have sought the ability to compete without anticompetitive
        restraint in the market for NIL payments, and would receive such compensation**

15   **absent Defendants' unlawful restraints.**

16   209.   While some student-athletes have been lucky enough to obtain waivers from the

17   NCAA, most are denied the opportunity to engage in any NIL-related activities and receive

18   compensation without losing NCAA eligibility. Despite the NCAA's purported aim "to create an

19   environment that allows student-athletes to reach their full potential in academics, athletics and

20   life"—and in contrast to their non-athlete counterparts—student-athletes know that even while

21   participating in intercollegiate sports competition at a high level and attending college as an student

22   at the same time, they are unable to pursue NIL opportunities that could significantly benefit them

23   financially, academically, and in their future careers.

24   210.   On October 9, 2019, the New York Times reported[123]:

27   _____
[123] Katelyn Ohashi, *Everyone Made Money Off My N.C.A.A. Career, Except Me*, N.Y. TIMES, Oct. 9, 2019, https://www.nytimes.com/2019/10/09/opinion/katelyn-ohashi-fair-play-act.html (last visited June 14, 2020).

CLASS ACTION COMPLAINT          - 68 -

"An exuberant top-scoring floor routine by UCLA's Katelyn Ohashi went viral this year, making her one of the most famous college gymnasts ever. But NCAA rules prevented Ohashi from making any money from the performance."

In a video op-ed featured in the article, Ohashi argues that college students should be given the ability to earn income from their athletic achievement:

"My senior year my routine went viral with over 100 million views. Along with this came a lot of attention and opportunities, but I couldn't capitalize on them. I was handcuffed by the NCAA rules that prevented me from deriving any benefit from my own name and likeness, despite the fact that after my final meet, I had no pro league to join. How different would things be for me had I been able to use my image and name in my last year of school in order to promote the things that I want to further my future? I want to make sure that the next person doesn't have to wonder."

Ohashi continued: "It's not about paying salaries to college athletes, it's about empowering student-athletes to rightfully earn off their individual name and likeness without sacrificing the opportunity to get an education. It's about making sure if a student-athlete's jersey is still selling in the bookstore ten years after graduation that they get a cut. It's about recognizing that women only receive 4% of all coverage in sports media, and giving us the freedom to leverage sponsored deals to break through. It's about treating student-athletes with the same respect as the other student who can freely profit off their talent as writers, artists, DJs, programmers, or scientists while in college."

Further she says, "critics say that allowing student-athletes to earn endorsement income will come at the expense of Title IX or non-revenue-generating sports. But from experience, allowing an athlete, especially a woman or Olympic sport athlete who for the most part are staying and graduating from NCAA institutions to take advantage of unexpected moments like I had, empowers us to help finally earn what we deserve."

211.   Lilly King, a world record-holder, two-time Olympic gold medalist, and the winningest breaststroke swimmer in NCAA history has also been an outspoken advocate of allowing student-athletes to benefit from their NILs. King attended Indiana University ("IU"). She was forced to turn down at least $60,000 in bonuses when she set two world records at the 2017 World Championships, although the NCAA did arbitrarily allow her to keep the other more than $100,000 that she was awarded by the USOC for her performance in the Olympics.

212.   In October 2019, King explained that IU, the Big Ten, and the NCAA were able to feature her in advertisements and announcements without compensation. They could promote her, she said, but she wasn't allowed to promote herself. King was quoted as saying: "I won an Olympic

1     gold medal at 19. So I still had to wait three more years to do anything to promote myself [before

2     finishing school]. As an athlete. As a Hoosier. These are things I'm proud of being."[124]

3          213.   When Katie Ledecky swam for Stanford after the 2016 Olympic Games, she could not

4     accept an estimated $5 million-a-year endorsement deal. Her teammate, 14-time NCAA champion

5     Simone Manuel, also forewent significant sponsorship opportunities.

6          214.   Recent analyses of the NIL value of student-athletes competing in several Division I

7     college sports demonstrate the economic harm to Plaintiff and Class Members caused by

8     Defendants' restraints. On May 25, 2020, news website Axios.com reported estimates by

9     Opendorse—a social publishing platform that helps professional athletes build their brands—of the

10    social media earnings that student-athletes could obtain if they were not prevented from doing so by

11    the NCAA. "Based on actual data from the last decade of providing the technology behind millions

12    of dollars of transactions between brands and professional athletes," Opendorse estimated positive

13    earnings for all of the student-athletes in its sample analysis, which included football players, men's

14    and women's basketball players, and female gymnasts. The analysis looked specifically at Twitter

15    and Instagram, evaluating the per-post value for various student-athletes. Based on its formula,

16    Opendorse estimated, for example, the annual lost value for social media posts by Sam Ehlinger,

17    quarterback of the University of Texas football team, at $962,000. As a second example, Morgan

18    Hurd, a gymnast at the University of Florida, had an estimated potential earning value of $44,000

19    from social media.[125]

20         215.   The website fivethirtyeight.com, which focuses on opinion poll analysis, politics, and

21    economics, also reported estimates by Opendorse of the potential social media earnings for a

22    different group of student-athletes. Opendorse's appraisals were "based on a decade's worth of

23    transactional data between businesses and professional athletes, specific to each respective sport.

24    _____

25    [124] David Woods, *Robbie Hummel, Lilly King favor college athletes profiting off their names and images*, Indystar.com, Oct. 2, 2019,

26    https://www.indystar.com/story/sports/college/purdue/2019/10/02/lilly-king-robbie-hummel-favor-college-athletes-profiting-off-names-images/3825833002/ (last visited June 14, 2020).

27    [125] Jeff Tracy, *How much college athletes could earn as social media influencers*, Axios.com, May 25, 2020, https://www.axios.com/college-athletes-earnings-social-media-influencers-35ce09f0-

28    3bc2-46fa-ae5a-eba8ff61079b.html (last visited June 14, 2020).

CLASS ACTION COMPLAINT                    - 70 -

Taking into account an athlete's current audience size, engagement rate and seven other proprietary data points, [Opendorse CEO Blake] Lawrence and his team at Opendorse distilled their estimates of an athlete's post value on Instagram and Twitter—and a potential range of earnings."[126] Opendorse examined the earning potential of student-athletes in nine different college sports—women's basketball, men's basketball, football, women's softball, men's wrestling, women's volleyball, women's soccer, and men's soccer—and projected positive social media earnings for each student-athlete examined. Two of the top four potential earners recognized in the study are female athletes, which is significant because women have fewer opportunities to continue their playing careers after graduating from college.[127] These analyses illustrate how the challenged restraints have had a negative economic impact on a wide range of Division I athletes, including those who are members of the Social Media Damages Sub-Class, described *infra* in Part VII.

216.     Moreover, as we explain in section VI.B *supra*, the NCAA, conferences, and schools make an enormous amount of money from, among other things, television broadcasting agreements that involve the use of student-athlete names, images, and likenesses. Defendants have been unjustly enriched from these deals at the expense of student-athletes, including those who are members of the Group Licensing Damages Sub-Class, described *infra* in Part VII. Moreover, in the absence of the challenged restraints, market-based competition would have led student-athletes to share in these revenues. These student-athletes, including those who are members of the Group Licensing Damages Sub-Class, would be able to offer group licenses, which they could sell to those seeking to use the student-athletes' names, images, and likenesses.

**6.     Corporate sponsors value student-athlete NILs, and would compete for the rights to use Plaintiff's NIL absent Defendants' anticompetitive restraints.**

217.     Business leaders have recognized that, absent the challenged restraints, there would be significant opportunities for college athletes to make commercial use of their NILs. Senior executives at the nation's leading influencer marketing companies are enthusiastic about the prospect

---

[126] Josh Planos, *How Much Money Could Student-Athletes Make As Social Media Influencers?*, fivethirtyeight.com, May 15, 2020, https://fivethirtyeight.com/features/how-much-money-could-student-athletes-make-as-social-media-influencers/ (last visited June 14, 2020).

[127] *Id.*

of being able to work with student-athletes, and many are already putting strategies into place to begin as soon as possible if the NCAA's rules change to allow it.

218.    According to Mae Karwowski, founder and CEO of Obvious.ly, her company is already hearing from its brands: "They're chomping at the bit. We're also ramping up our talent and recruitment efforts to make sure that athletes have the best possible representation and contracts as they're entering this space. People love sports, and social media is a huge overdue opportunity for college athletes."[128]

219.    Stephanie Stabulis, Vice President of HireInfluence confirmed that, "in 2018-2019 alone, our company has developed strategies for at least four to five brands targeting student-athletes, and we have been restricted due to the NCAA regulations. The demand is already there, so we see potential for brands to move quickly to work with student-athletes." Regardless of their star status, Stabulis says there is money for student-athlete influencers at every level while they are still in college: "Because it's a niche market, we can expect influencers to be able to make about $250 to $1,000 per post, at these lower beginning ranges. That will escalate as the athlete can reach more people through their social media outlets… For endorsement deals that rely on paying for an athlete's name, likeness and deeper partnership or ambassadorship, we anticipate this is higher."[129]

220.    Matthew Micheli, co-founder and managing partner at Viral Nation explained that "some of these athletes could arguably be more popular than their pro counterparts. For example, Tua Tagovailoa in college football would probably out-earn 90% of starting NFL quarterbacks if given the opportunity. I could almost guarantee that." Micheli says Instagram and YouTube are the two most valuable social media platforms for monetization right now and that a student-athlete with a following of over 25,000 could earn $2,000 to $4,000 per month between digital advertisements

---

[128] Kristi Dosh, *Marketers Bullish On Monetization Opportunities for NCAA Athletes with NIL Rights*, forbes.com, Dec. 3, 2019, https://www.forbes.com/sites/kristidosh/2019/11/25/marketers-bullish-on-monetization-opportunities-for-student-athletes-with-nil-rights/#f25fd487aa49 (last visited June 14, 2020).

[129] *Id.*

1    and local sponsorships. According to Micheli, "for athletes who produce video content, their

2    earnings can easily be in the six-figure range annually to start."[130]

3         221.    Micheli also commented on the extremely limited timeframe student-athletes have to

4    take advantage of their NIL value: "Once the college athlete's career is over and they don't go pro,

5    their marketability essentially goes away … Endorsements will most likely become non-existent.

6    They become old news unless they go pro or go into another career that would require them to keep

7    up a social presence. There could be some anomalies or outliers to this, but for the most part, all is

8    lost for them, unfortunately."[131]

9         222.    Social media companies are also working with universities to prepare for a world in

10   which student-athletes are able to profit from their NILs.

11        223.    On March 10, 2020, the University of Nebraska announced its partnership with

12   Opendorse to launch the first program designed to help student-athletes build their personal brands

13   and maximize their earning potential if the NCAA's NIL restraints are lifted. The Ready Now

14   program will be available to athletes in all varsity sports and will offer each athlete a current

15   valuation of their personal brand, review and flag content that could have a negative impact on that

16   brand, and provide insight to increase value.

17        224.    Opendorse CEO and former Nebraska football player, Blake Lawrence, recently

18   indicated that the company has "been preparing for this moment for over seven years." According to

19   Lawrence, "today, every professional athlete endorsement starts with an analysis of the athlete's

20   digital presence, and we expect the same to be true with student-athletes." Lawrence noted that

21   "social media monetization … levels the playing field, as any athlete—from Heisman contenders to

22   walk-ons—can build an audience that sponsors or advertisers value… it may be easier for superstars,

23   but every athlete will have the opportunity to leverage free, widely accessible technology platforms

24   to grow and monetize their NIL … While most will not be national names, organizations in local

25

26

27       [130] *Id.*

28       [131] *Id.*

CLASS ACTION COMPLAINT              - 73 -

markets stand to provide real opportunity and receive significant value by partnering with regional and local student-athletes upon changes to NIL regulation."

225.    Based on his personal and professional experience, Lawrence also explained how schools would compete during the recruiting process if Defendants' unlawful restraints did not exist. "Showcasing the value of going to schools XYZ, or one university over another, showing that current school's earning power, that's going to be huge," Lawrence has said. If the rules were changed, schools would have to answer from recruits: "How much money can I make off my name, image and likeness if I go to your school versus another school?"[132]

## VII.    CLASS ACTION ALLEGATIONS

226.    Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(2) on his own behalf and on behalf of the following Class:

The "Declaratory and Injunctive Relief Class"—

> All current and former student-athletes who compete on, or competed on, an NCAA Division I athletic team at any time between four (4) years prior to the filing of this Complaint and the date of judgment in this matter.

> This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

227.    Plaintiff also brings this action under Federal Rule of Civil Procedure 23(b)(3) on his own behalf and on behalf of the following Sub-Class:

The "Social Media Damages Sub-Class"—

> All current and former student-athletes who compete on, or competed on, an NCAA Division I athletic team at a college or university that is a member of one of the Power Five Conferences, at any time between four (4) years prior to filing of this Complaint and the date of judgment in this matter.

> This Sub-Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding

---

[132] Josh Planos, *How Much Money Could Student-Athletes Make As Social Media Influencers?*, fivethirtyeight.com, May 15, 2020, https://fivethirtyeight.com/features/how-much-money-could-student-athletes-make-as-social-media-influencers/ (last visited June 14, 2020).

over this action and their immediate family members and staff, and any
juror assigned to this action.

228.    On behalf of the members of the Social Media Damages Sub-Class, Plaintiff seeks the

social media earnings that members of this Sub-Class would have received absent Defendants'

unlawful conduct.

229.    Plaintiff also brings this action under Federal Rule of Civil Procedure 23(b)(3) on his

own behalf and on behalf of the following Sub-Class:

The "Group Licensing Damages Sub-Class"—

All current and former student-athletes who compete on, or competed
on, an NCAA Division I men's or women's basketball team or an FBS
football team, at a college or university that is a member of one the
Power Five Conferences, at any time between four (4) years prior to
filing of this Complaint and the date of judgment in this matter.

This Sub-Class excludes the officers, directors, and employees of
Defendants. This Sub-Class also excludes all judicial officers presiding
over this action and their immediate family members and staff, and any
juror assigned to this action.

230.    On behalf of the members of the Group Licensing Damages Sub-Class, Plaintiff seeks

the share of game telecast group licensing revenue that members of this Sub-Class would have

received absent Defendants' unlawful conduct.

231.    The Declaratory and Injunctive Relief Class, the Social Media Damages Sub-Class,

and the Group Licensing Damages Sub-Class are referred to collectively herein as "the Classes."

232.    In addition to seeking certification of nationwide classes for their antitrust claims, *see*

First and Second Claims for Relief, *infra*, Plaintiff also seeks certification of a nationwide class for

purposes of his unjust enrichment claims, *see* Third Claim for Relief, *infra*.

233.    The Classes are so numerous that joinder of all members is impracticable. While the

exact number of members each of the Classes is unknown to Plaintiff at this time and can only be

discerned through discovery, Plaintiff is informed and believes that there are several thousand

members of each of the Classes.

234.    Plaintiff's claims are typical of the claims of the other members of the Classes.

Plaintiff and other members of the Classes sustained damages arising out of Defendants' common

course of conduct in violation of law as complained herein. The injuries and damages of each member of the Classes were directly caused by Defendants' wrongful conduct in violation of laws as alleged herein.

235.    Plaintiff will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

236.    Numerous common questions of law and fact exist as to all members of the Classes, and these common questions predominate over any questions affecting solely individual members of the Classes. Although in many cases the Defendants admit that they have in fact engaged in the conduct listed below, nevertheless among the questions of law and fact common to the Classes are:

    a.    Whether Defendants engaged in a contract, combination, or conspiracy to unreasonably restrain trade by limiting the compensation available to members of the Classes for use of their names, images and/or likenesses;

    b.    Whether such conduct caused members of the Classes to receive less compensation than members of the Classes would have received for use, of their names, images, and/or likenesses in a truly competitive market;

    c.    The duration of the contract, combination, or conspiracy alleged herein;

    d.    Whether Defendants violated Section 1 of the Sherman Act;

    e.    Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and Class Members; and

    f.    Whether the Class is entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

237.    Additional common questions of law and fact specific to the Social Media Damages Sub-Class and Group Licensing Damages Sub-Class include the following:

    a.    The appropriate measure of damages sustained by Plaintiff and Sub-Class Members; and

    b.    Whether Defendants have been unjustly enriched.

238.    Defendants have acted or refused to act on grounds generally applicable to the members of Declaratory and Injunctive Relief Class, thereby making final injunctive relief appropriate for the members of the Declaratory and Injunctive Relief Class as a whole.

239.   Plaintiff's claims are typical of the Class because the NIL restraints have injured both Plaintiff and the members of the Classes.

240.   Plaintiff is an adequate representative of the Classes and will protect the claims and interests of the Classes. Plaintiff does not have interests that conflict with those of the Classes and Plaintiff will vigorously prosecute the claims alleged herein.

241.   A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by Plaintiff and each member of the Classes are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for Plaintiff and members of the Classes to redress the wrongs done to them. It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   ANTITRUST ALLEGATIONS

242.   Defendants' contract, combination, and conspiracy described herein consisted of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to artificially fix, depress, maintain, and/or stabilize prices received by Plaintiff and Class Members for the use of his name, image and/or likeness in the United States, its territories and possessions.

243.   In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things:

        a.   agreeing to artificially fix, depress, maintain, and/or stabilize prices paid to Plaintiff and Class Members for the use of his name, image and/or likeness; and

b.    implementing and monitoring the conspiracy among cartel members.

244.    The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreement to fix, depress, maintain and/or stabilize prices paid to Plaintiff and Class Members for the use of his name, image and/or likeness.

245.    Defendants' actions constitute an unreasonable restraint of trade.

## IX.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**
**Unreasonable Restraint of Trade**

246.    Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

247.    Defendants and their co-conspirators, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, have entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade in the relevant market to artificially depress, fix, maintain, and/or stabilize the prices paid (specifically, depressing, fixing, maintaining and stabilizing them at zero dollars) to members of the Classes for the use of, and to limit supply for, licensing and sale of their images, likenesses and/or names in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). If Plaintiff and Class Members were free to license and sell the rights to their images, likenesses and/or names, many more licenses would be sold. This output restriction also has the effect of raising the prices charged by the NCAA and its members for licensing rights.

248.    Defendants' unlawful conduct deprived Plaintiff and members of the Classes of compensation for the use of their names, images, and likenesses—property rights with economic value. This unreasonable restraint on competition has artificially limited supply and depressed compensation paid to Plaintiff and the members of the Classes for use of their images, likenesses and/or names.

249.    Plaintiff and the members of the Classes received less than they otherwise would have received for the use of their images, likenesses and/or names in a competitive marketplace, were thus damaged, and seek to recover for those damages.

250.    On information and belief, the NCAA always conditioned eligibility to play NCAA Division I sports on the relinquishment to the NCAA and its members by the student-athlete of all rights to his or her image, likeness and/or name associated with the playing of those sports.

251.    Defendants and their co-conspirators' total abridgment of compensation rights for current and former student-athletes are not connected to any legitimate non-commercial goal. Defendants' actions are solely to enhance revenue for themselves and their for-profit business partners by, for example, being able to take all of the revenue related to the commercial use of student-athletes' names, images, and likenesses for themselves. Defendants' actions have no relationship to any alleged goal of "amateurism," or any legitimate procompetitive purpose. The NCAA's actions directly regulate a commercial market and therefore are illegal.

252.    As a direct and proximate result of Defendants' scheme, Plaintiff and the members of the Classes have been injured and financially damaged. Plaintiff's and Class Members' injuries consist of receiving lower prices for use of their NILs than they would have received absent Defendants' conduct. Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

253.    Defendants and their co-conspirators have collectively conspired to illegally limit and depress the compensation to student-athletes for use of their NILs to zero. This anticompetitive and illegal scheme has unreasonably restrained trade.

254.    The anticompetitive effects of Defendants' scheme substantially outweigh any alleged procompetitive effects that may be offered by Defendants, including that their collusive conduct is shielded by the NCAA's concept of "amateurism." Moreover, reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

255.    The amount of damages suffered by Plaintiff and the members of the Classes has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Plaintiff is entitled to recover from Defendants treble the amount of actual damages, as well as an award of reasonable attorneys'

CLASS ACTION COMPLAINT                              - 79 -

1    fees and costs of suit.

2        256.    Plaintiff and members of the Classes are entitled to a permanent injunction that

3    terminates the ongoing violations alleged in this Complaint.

4                                **SECOND CLAIM FOR RELIEF**

5              **Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**
             **Unreasonable Restraint of Trade – Group Boycott / Refusal to Deal**
6
         257.    Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint
7
     as if fully set forth herein.
8
         258.    Defendants and their co-conspirators, by and through Defendants' and co-
9
     conspirators' officers, directors, employees, agents, or other representatives, entered into a
10
     continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade to
11
     effectuate a horizontal group boycott of members of the Classes. Defendants' group boycott/refusal
12
     to deal encompasses Defendants' concerted acts to prevent Class Members from being compensated
13
     for use of their images, likenesses and/or names and/or their concerted refusal to permit
14
     compensation to be paid to members of the Classes for use of their images, likenesses and/or names,
15
     in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act
16
     (15 U.S.C. § 1).
17
         259.    Defendants' group boycott/refusal to deal includes Defendants' concerted action to
18
     require all current student-athletes to abide by regulations and bylaws that purport to require each of
19
     them to relinquish all rights for use of their images, likenesses and/or names. This concerted action is
20
     in effect a refusal to deal with members of the Classes on compensation rights issues, and forecloses
21
     them from access to the market. Defendants use the eligibility rules as a threat of a boycott to force
22
     all student-athletes to abide by the rules.
23
         260.    Defendants' group boycott/refusal to deal also includes Defendants' ongoing
24
     concerted action to deny Class Members compensation in the form of royalties for the continued use
25
     of their images, likenesses and/or names for profit, including, but not limited to, through restrictions
26
     in the bylaws.
27

28

261.    Plaintiff and the members of the Classes received less than they otherwise would have received for the use of their NILs in a competitive marketplace, were thus damaged, and seek to recover for those damages.

262.    On information and belief, the NCAA always conditioned eligibility to play NCAA Division I sports on the relinquishment to the NCAA and its members by the student-athlete of all rights to his image, likeness and/or name associated with the playing of those sports.

263.    Defendants and their co-conspirators' total abridgment of compensation rights for student-athletes are not connected to any legitimate non-commercial goal. Defendants' actions are solely to enhance revenue for themselves and their for-profit business partners, by, for example, being able to take all of the revenue related to the commercial use of student-athletes' names, images, and likenesses for themselves. Defendants' actions have no relationship to any alleged goal of preserving "amateurism," or any procompetitive purpose. The NCAA's actions directly regulate a commercial market and therefore are illegal.

264.    As a direct and proximate result of Defendants' group boycott, Plaintiff and the members of the Classes have been injured and financially damaged. Plaintiff's and Class Members' injuries consist of denial of compensation for use of their images, likenesses and/or names. Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

265.    Defendants and their co-conspirators have collectively conspired to illegally deny compensation to student-athletes for continued use of their images, likenesses and/or names in unreasonable restraint of trade.

266.    The anticompetitive effects of Defendants' group boycott substantially outweigh any alleged procompetitive effects that may be offered by Defendants, including that their collusive conduct is shielded by the NCAA's concept of "amateurism" or any procompetitive purpose. Moreover, reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

267.    The amount of damages suffered by Plaintiff and the members of the Classes has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Plaintiff is entitled to recover

from Defendants treble the amount of actual damages, as well as an award of reasonable attorneys' fees and costs of suit.

268.     Plaintiff and the Classes are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint.

### THIRD CLAIM FOR RELIEF

### Unjust Enrichment

269.     Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

270.     Defendants have been unjustly enriched as a result of the unlawful conduct detailed herein at the expense of Plaintiff and Class Members. Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred upon them via their wrongful conduct, and it would be unjust for them to be allowed to do so.

271.     Plaintiff seeks disgorgement of all Defendants' profits resulting from the wrongful conduct described herein and establishment of a constructive trust from which Plaintiff and the Class Members may seek restitution.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, request judgment as follows:

A.     For actual damages according to the proof at trial;

B.     For treble damages pursuant to 15 U.S.C. § 15;

C.     For a declaratory judgment declaring as void the NCAA's Bylaws that operate to impose a restriction on the compensation student-athletes can receive in exchange the commercial use of their names, images, and likenesses;

D.     For an injunction restraining the NCAA and Conference Defendants from enforcing their unlawful and anticompetitive agreement to restrict the amount of NIL compensation available to Class Members;

E.     For Plaintiff's attorneys' fees, costs, and expenses; and

F.     For other such relief that the Court may deem just and equitable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### JURY DEMAND

Plaintiff, on behalf of himself and all others similarly situated, hereby request a jury trial on any and all claims so triable.

DATED this 8th day of July, 2020                Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO, LLP

By:   */s/ Benjamin J. Siegel*

Benjamin J. Siegel (#256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

Jeffrey L. Kodroff (*pro hac vice* to be filed)
Eugene A. Spector (*pro hac vice* to be filed)
SPECTOR ROSEMAN KODROFF & WILLS, PC
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
jkodroff@srkattorneys.com
espector@srkattorneys.com

*Counsel for Plaintiff and the Proposed Classes*